No. 24-1367

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

JOE MANIS,

*Appellant*,

v.

U.S. DEPARTMENT OF AGRICULTURE; THOMAS JAMES VILSACK,
in his official capacity as the Secretary of Agriculture; MICHAEL WATSON,
in his official capacity as Administrator of the Animal
and Plant Health Inspection Service,

*Appellees*.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF NORTH CAROLINA
CASE NO. 1:24-CV-00175-WO-JLW

_____

**OPENING BRIEF OF APPELLANT**

_____

THOMAS B. KAKASSY
P.O. Box 2436
Gastonia, NC 28053
(704) 867-1820
Tom@kakassylaw.com

JOSHUA M. ROBBINS
ALLISON D. DANIEL
PACIFIC LEGAL FOUNDATION
3100 Clarendon Blvd.
Suite 1000
Arlington, VA 22201
(202) 945-9524
JRobbins@pacificlegal.org
ADaniel@ pacificlegal.org

*Counsel for Appellant*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Appellant Joe Manis states that, consistent with his Disclosure Statement filed April 25, 2024 (Doc. 8), he is an individual and no publicly held corporation or other publicly held entity has a direct financial interest in the outcome of the litigation.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ....................................................... i

TABLE OF AUTHORITIES ................................................................ iv

JURISDICTIONAL STATEMENT .......................................................1

STATEMENT OF ISSUES ............................................................2

INTRODUCTION ....................................................................4

STATEMENT OF THE CASE...........................................................5

  I.  Tennessee Walking Horses and the HPA .......................................5

  II.  USDA's In-House Adjudication Process........................................7

  III. Procedural History ........................................................9

SUMMARY OF THE ARGUMENT ....................................................11

ARGUMENT .....................................................................15

  I.  Standard of Review.........................................................15

  II.  Manis Is Likely to Succeed on the Merits of His Claims ..............................15

    A. The Judicial Officer Unconstitutionally Exercises Principal
       Officer Power ..........................................................16

      1. The Judicial Officer Functions as a Principal Officer Without a
         Proper Appointment .........................................................18

        a. The Judicial Officer's Decisions Cannot Be Reviewed by a
           Principal Officer ...........................................................22

        b. Removability and Administrative Oversight Provide Insufficient
           Supervision of the Judicial Officer.................................................24

        c. The Judicial Officer Is Not Appointed as a Principal Officer.........28

2. The Judicial Officer Does Not Hold an Office Created by Statute .....29

3. The ALJs Are Improperly Supervised Inferior Officers.....................32

B. USDA ALJs Are Unconstitutionally Protected from Removal................36

C. Manis Is Entitled to a Jury Trial Under the Seventh Amendment...........38

1. The Allegation Against Manis Is a Common Law Action in Debt That Requires a Jury Trial ...........................................................39

2. The HPA Allegation Against Manis Cannot Be Assigned to the Executive Branch.................................................................................39

D. Article III Requires the HPA Allegation Against Manis to be Tried in an Article III Court ...............................................................................44

III. This Court Should Order the Entry of an Injunction .....................................45

A. Manis Is Irreparably Injured by Being Subjected to the Unconstitutionally Structured USDA Adjudication ..................................45

B. A Preliminary Injunction Is in the Public Interest.....................................46

CONCLUSION ........................................................................................................47

STATEMENT IN SUPPORT OF ORAL ARGUMENT ........................................48

CERTIFICATE OF COMPLIANCE.......................................................................49

CERTIFICATE OF SERVICE ...............................................................................50

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
   594 U.S. 758 (2021) ........................................................................47

*Atlas Roofing Co., Inc. v. OSHRC*,
   430 U.S. 442 (1977) ...............................................39, 40–41, 44

*Axon Enterprise, Inc. v. FTC*,
   598 U.S. 175 (2023) .................................................................*passim*

*Ballard v. Comm'r*,
   544 U.S. 40 (2005) .............................................................23, 35

*Berlin v. Dep't of Lab.*,
   772 F.3d 890 (Fed. Cir. 2014) ........................................................37

*Bungie, Inc. v. L.L.*,
   No. 2:22-cv-0981, 2023 WL 3318588 (W.D. Wash. May 9, 2023) ..................43

*Burnap v. United States*,
   252 U.S. 512 (1920) .............................................................29–30, 32

*Centro Tepeyac v. Montgomery Cnty.*,
   722 F.3d 184 (4th Cir. 2013) ........................................................47

*Crowell v. Benson*,
   285 U.S. 22 (1932) .............................................................43, 44

*Edmond v. United States*,
   520 U.S. 651 (1997) .................................................................*passim*

*Evaluation Rsch. Corp. v. Alequin*,
   439 S.E.2d 387 (Va. 1994) ........................................................42

*Frazier v. Prince George's Cnty.*,
   86 F.4th 537 (4th Cir. 2023) ........................................................15

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010)............................................................................37, 38

*Granfinanciera, S.A. v. Nordberg*,
    492 U.S. 33 (1989)................................................................................*passim*

*Jarkesy v. SEC*,
    34 F.4th 446 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 2688 (2023) .........*passim*

*In re Kenny Compton*,
    78 Agric. Dec. 151 (U.S.D.A. Feb. 25, 2019) ...............................................8, 33

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*,
    2 F.4th 330 (4th Cir. 2021) (en banc) ......................................................15, 45–47

*Lucia v. SEC*,
    585 U.S. 237 (2018)...............................................................................*passim*

*McConnell v. USDA*,
    No. 4:23-CV-24, 2023 WL 5963782 (E.D. Tenn. Sept. 13, 2023) ....................24

*Miranda v. Garland*,
    34 F.4th 338 (4th Cir. 2022) ........................................................................45–46

*Morgan v. United States*,
    298 U.S. 468 (1936)......................................................................................8

*Morgan v. United States*,
    304 U.S. 1 (1938).........................................................................................8

*N. Pipeline Const. Co. v. Marathon Pipe Line Co.*,
    458 U.S. 50 (1982)......................................................................................40

*Parsons v. Bedford, Breedlove & Robeson*,
    28 U.S. (3 Pet.) 433 (1830).........................................................................38

*In re: Philip Trimble*,
    77 Agric. Dec. 15 (U.S.D.A. June 8, 2018)....................................................7, 33

*Sasser v. Adm'r, E.P.A.*,
    990 F.2d 127 (4th Cir. 1993) ........................................................................39

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) .................................................................20, 36

*Sierra Club v. United States Army Corps of Engineers*,
981 F.3d 251 (4th Cir. 2020) ...............................................46

*Stern v. Marshall*,
564 U.S. 462 (2011).............................................................42–43, 45

*Tull v. United States*,
481 U.S. 412 (1987).............................................................38–39

*United States v. Arthrex*,
594 U.S. 1 (2021)...............................................................*passim*

*United States v. McHan*,
345 F.3d 262 (4th Cir. 2003) ...............................................41

*United States v. Wonson*,
28 F. Cas. 745 (C.C.D. Mass. 1812)..................................39

*Utica Packing Co. v. Block*,
781 F.2d 71 (6th Cir. 1986) ........................................*passim*

*Vessels in Foreign & Domestic Trades*,
13 Cust. B. & Dec. 76 (1979) ...........................................26

*Vitkus v. Blinken*,
79 F.4th 352 (4th Cir. 2023) .......................................15, 45

*Walmart, Inc. v. King*,
No. CV 623-040, 2024 WL 1258223 (S.D. Ga. Mar. 25, 2024) .................37–38

*West Virginia v. EPA*,
90 F.4th 323 (4th Cir. 2024) ...............................................47

*In Re: William J. Reinhart & Reinhart Stables*,
59 Agric. Dec. 721 (U.S.D.A. Nov. 9, 2000) ....................27

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7 (2008)...............................................................11

*Withrow v. Larkin*,
    421 U.S. 35 (1975)...................................................................35

*In re: World Wide Citrus*,
    50 Agric. Dec. 319 (U.S.D.A. May 9, 1991)......................8, 27, 31, 32

**Statutes**

5 U.S.C. § 556 .......................................................................8, 27, 32

5 U.S.C. § 557 ...............................................................................32

5 U.S.C. § 1202(d) ...............................................................34, 37–38

5 U.S.C. § 3105 ....................................................................7, 32–33

5 U.S.C. § 5372 .........................................................................32, 34

5 U.S.C. § 7513(a) ........................................................................25

5 U.S.C. § 7521 ........................................................................34, 37

7 U.S.C. § 2204-2 ...............................................9, 27, 30–31, 35

7 U.S.C. § 2204-3 .........................................8, 9, 22, 26, 35

15 U.S.C. § 1821 ......................................................................1, 6

15 U.S.C. § 1822(2) ................................................................6, 42

15 U.S.C. § 1823(c) and (e) .........................................................7

15 U.S.C. § 1824 ..............................................................6, 41–42

15 U.S.C. § 1825 ...........................................................1, 7, 17, 39

28 U.S.C. § 1292(a)(1) ..................................................................1

28 U.S.C. § 1331 ...........................................................................1

**Constitution**

U.S. CONST. amend. VII..................................................................38

U.S. Const. art. II ................................................................ *passim*

U.S. Const. art. III ..................................................................... 44

**Other Authorities**

7 C.F.R. § 1.130 ........................................................................ 23

7 C.F.R. § 1.131 ............................................ 7, 26, 33–34, 43

7 C.F.R. § 1.133 .................................................................. 7, 21

7 C.F.R. § 1.139 .................................................................. 8, 23

7 C.F.R. § 1.142 .................................................................. 8, 23

7 C.F.R. § 1.144 .............................................................. 7–8, 33

7 C.F.R. § 1.145 ................................ 7, 8, 22–23, 27, 33, 35, 43

7 C.F.R. § 1.151(b) ................................................................... 34

7 C.F.R. § 2.27 ........................................................ 7, 8, 33, 43

7 C.F.R. § 2.35 ..................... 7–9, 17, 22–23, 26, 30, 33, 35, 43

7 C.F.R. § 2.4 ........................................................................... 30

9 C.F.R. § 11.1. ................................................................. 26, 34

9 C.F.R. § 11.4 ........................................................................... 7

9 C.F.R. § 11.7 ........................................................................... 7

9 C.F.R. § 11.20 ......................................................................... 7

9 C.F.R. § 11.25(f) ..................................................................... 7

10 Fed. Reg. 13,769 (Nov. 9, 1945) ........................ 9, 17, 30–31

18 Fed. Reg. 3219 (June 5, 1953) ..................................... 30–31

37 Fed. Reg. 6327 (Mar. 28, 1972) ........................................ 26

44 Fed. Reg. 25,172 (Apr. 27, 1979) ....................................... 26

88 Fed. Reg. 30,029 (May 10, 2023) ........................................................................7

*About the Judicial Officer*, U.S. Dep't of Agric.,
    https://www.usda.gov/oha/ojo/judicial-officer (last visited May 11,
    2024) ..............................................................................................................17, 28

Restatement (Second) of Torts § 525 (1977) ..........................................................42

# JURISDICTIONAL STATEMENT

The district court and this Court have subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Appellant Joe Manis's claims regard violations of the U.S. Constitution in connection with the U.S. Department of Agriculture's ("USDA") internal adjudication process in which Manis is defending himself against an alleged violation of the federal Horse Protection Act, 15 U.S.C. § 1821 *et seq*.; JA005–030. Jurisdiction is also proper under 15 U.S.C. § 1825(d)(6), which gives U.S. district courts jurisdiction over actions to enforce the Horse Protection Act and "all other kinds of cases arising under the [Horse Protection Act], except as provided in subsection (b) of this section." Manis is not presently seeking review of a violation and civil penalty assessment pursuant to § 1825(b). JA005–030. Additionally, the district court and this Court have jurisdiction to review Manis's structural constitutional claims prior to the conclusion of USDA's adjudication process pursuant to *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175, 195–96 (2023).

The district court entered an order denying Manis's motion for a preliminary injunction on April 24, 2024. JA091–113. Manis filed his notice of appeal also on April 24, 2024, which was timely pursuant to Federal Rule of Appellate Procedure 4(a)(1)(B). JA114–116. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1292(a)(1) because this appeal is from an order denying a preliminary injunction.

1

**STATEMENT OF ISSUES**

I.  Whether the district court erred in concluding that Manis failed to show a likelihood of success on the merits of his claims that the U.S. Department of Agriculture's ("USDA") adjudication process for Horse Protection Act ("HPA") enforcement actions is unconstitutionally structured:

    a.  Whether USDA's final adjudication decisionmaker—the Judicial Officer—is unconstitutionally exercising principal officer power without being appointed as a principal officer consistent with the Appointments Clause.

    b.  Whether USDA's administrative law judges are unconstitutionally protected from removal with two layers of tenure protection.

    c.  Whether Manis is entitled to a jury trial on USDA's HPA enforcement claim, which is effectively a common law claim with civil penalties.

    d.  Whether Article III requires USDA's HPA enforcement action, which is effectively a common law claim with civil penalties, to be heard in an Article III court.

II. Whether this Court should order the district court to enter a preliminary injunction.

    a.  Whether Manis is irreparably injured by being subjected to an unconstitutionally structured USDA administrative adjudication.

b. Whether a preliminary injunction of Manis's USDA administrative adjudication is in the public interest.

**INTRODUCTION**

Manis is seeking a preliminary injunction of an ongoing internal USDA proceeding adjudicating USDA's single allegation that he violated the HPA (HPA Docket No. 23-J-0044) (the "USDA Adjudication") while his structural constitutional challenges are litigated. Last year, the Supreme Court recognized that being subjected to an "unconstitutionally structured decisionmaking process" is a "'here-and-now'" injury that can be redressed in federal court before the adjudication concludes. *Axon*, 598 U.S. at 192. Any relief must come before the end of the adjudication because, once over, the adjudication process "cannot be undone" and there is no other way to redress the loss of a right not to have been subjected to it. *Id.* at 191–92. So, in cases like Manis's, a preliminary injunction is necessary to stop the ongoing irreparable injury and allow the constitutional claims to be fully litigated while relief is still available.

Here, Manis has satisfied the four factors for the issuance of a preliminary injunction. Most importantly, he has demonstrated he is likely to succeed on the merits of his constitutional claims, meaning the USDA Adjudication is an "unconstitutionally structured decisionmaking process." *Id.* at 192. Final decisions in USDA's internal adjudication process—a power that must be exercised by a principal officer—have been left to an employee whose appointment is inconsistent with the Appointments Clause. USDA's administrative law judges ("ALJs"), who

make initial decisions in USDA adjudications, are unconstitutionally protected from removal with two layers of tenure protection. And the HPA claim being pursued against Manis involves private rights that must be litigated in an Article III court with a jury. Because Manis has demonstrated that the USDA adjudication is unconstitutionally structured, he is suffering an irreparable injury by being subjected to it on an ongoing basis. Moreover, enjoining the USDA Adjudication is in the public interest because it is always in the public interest to prevent the government from acting unlawfully. To provide meaningful relief to Manis, this Court should reverse the district court's erroneous legal determinations on his constitutional claims and order that a preliminary injunction issue.

## STATEMENT OF THE CASE

### I. Tennessee Walking Horses and the HPA

Manis is currently defending himself in the USDA Adjudication against a single allegation that he violated the HPA. JA037. Manis is a retired North Carolina businessman, who has spent decades involved in the Tennessee Walking Horse community. JA005. He has been an active member of the North Carolina Walking Horse Association ("NCWHA") for 30 years. JA005. He has many times served as president of the NCWHA, and has served in virtually every position with that association at some time. JA008. In January 2024, Manis for the second time received the NCWHA's Senior Horse Person award, given to recognize participants

who best epitomize sportsmanship, success, and contributions to the good of the walking horse breed. JA008.

The Tennessee Walking Horse is the basis for a significant horse-showing industry. *See* JA007. The horses have three distinctive gaits—the flat-foot walk, running walk, and canter—and are shown in competitions across the southeast United States. JA007. Tennessee Walking Horse participants have sometimes engaged in the unfortunate practice of horse soring. JA008. Soring is the inflicting of pain on the legs of a horse through devices or chemicals to exaggerate the horse's gait for advantage in competitions. 15 U.S.C. §§ 1821(3), 1822(2).

In 1970, Congress passed the HPA in an effort to prohibit horse soring in competitive events. 15 U.S.C. § 1821 *et seq*. The HPA does not ban the practice of soring itself, but prohibits, among other things, the showing or exhibition of sore horses. 15 U.S.C. § 1824(2). The HPA defines soring as the practice of applying "irritating or blistering agent[s]," inflicting "burn[s], cut[s], or laceration[s]," inserting "any tack, nail, screw, or chemical agent," or the use of "any other substance[s] or device[s]" on the limb of a horse that cause "or can reasonably be expected" to cause "physical pain or distress, inflammation, or lameness when walking, trotting, or otherwise moving." 15 U.S.C. § 1821(3).

The HPA is enforced through inspections at horse shows conducted by licensed individuals appointed by the show's management and by USDA employees.

15 U.S.C. § 1823(c) and (e); 9 C.F.R. §§ 11.4 and 11.7. Horses found to be sore in the opinion of the inspector must be disqualified from the competition. 9 C.F.R. § 11.20(a) and (b). And USDA can initiate civil enforcement proceedings to address disqualifications. *See* 9 C.F.R. § 11.25(f).

The Secretary can impose civil monetary penalties of up to $6,781 per violation and disqualify violators from the walking horse industry after notice and a hearing. 15 U.S.C. § 1825(b) and (c); 88 Fed. Reg. 30,029, 30,032 (May 10, 2023). The Secretary directed that hearings on alleged violations of the HPA be conducted through USDA's in-house adjudication process and delegated his final decision-making authority to USDA's Judicial Officer. *See* 7 C.F.R. §§ 1.131, 1.144–45, 2.27, 2.35.

## II.    USDA's In-House Adjudication Process

USDA operates an internal administrative hearing process to adjudicate its civil enforcement actions pursuant to several statutes, including the HPA. 7 C.F.R. §§ 1.131, 1.133. Administrative law judges ("ALJs") make the initial decision in each adjudication, 7 C.F.R. § 2.27(a)(1), and are appointed pursuant to 5 U.S.C. § 3105, which provides for the appointment of all ALJs. USDA ALJ appointments are made by the Secretary of Agriculture (the "Secretary"). *See, e.g.*, *In re: Philip Trimble*, 77 Agric. Dec. 15, 17 (U.S.D.A. June 8, 2018). They exercise their decision-making authority through a designation by the Secretary pursuant to the

Administrative Procedure Act ("APA"). 5 U.S.C. § 556(b)(3); 7 C.F.R. § 2.27(a)(1). USDA ALJs are empowered to manage hearings like a trial-court judge. 7 C.F.R. § 1.144(c). Their initial decisions are only reviewed if appealed. 7 C.F.R. §§ 1.139, 1.142(c)(4), 1.145(a), 2.27(a)(1).

An ALJ's initial decision can only be appealed to USDA's Judicial Officer. 7 C.F.R. §§ 1.145, 2.35. The Judicial Officer hears appeals by reviewing the parties' briefs and the ALJ record, presiding over oral argument, and issuing a final decision for USDA. 7 C.F.R. § 1.145. Judicial Officer decisions are precedential for ALJs, *see In re Kenny Compton*, 78 Agric. Dec. 151, at *4 (U.S.D.A. Feb. 25, 2019), and are "final for purposes of judicial review." 7 C.F.R. §§ 1.139, 1.142(c)(4), 1.145(i). The Secretary cannot review the Judicial Officer's decisions. 7 U.S.C. § 2204-3; *see also Utica Packing Co. v. Block*, 781 F.2d 71, 78 (6th Cir. 1986).

The Judicial Officer position arose from two 1930s Supreme Court decisions requiring the decisionmaker in an adjudicatory proceeding to conduct a "hearing in a substantial sense" before issuing a decision. *See Morgan v. United States*, 298 U.S. 468, 481 (1936); *Morgan v. United States*, 304 U.S. 1, 16–22 (1938). The *Morgan* decisions left the Secretary with the task of hearing evidence and argument himself for all USDA "quasijudicial functions." *In re: World Wide Citrus*, 50 Agric. Dec. 319, 335 (U.S.D.A. May 9, 1991). But that was impossible for the Secretary to accomplish. *See id.* at 335, 339. So, in 1940, Congress granted the Secretary the

authority to delegate his final decision-making power to not more than two "officers or employees" of USDA. 7 U.S.C. § 2204-2. The Secretary's delegations of authority are "vested by law in the individual to whom the delegation is made, instead of in the Secretary." 7 U.S.C. § 2204-3. Pursuant to § 2204-2, the Secretary created the position of Judicial Officer and delegated to him the Secretary's final decision-making authority in many USDA adjudications, including civil enforcement of the HPA. 7 C.F.R. § 2.35; *see also, e.g.*, 10 Fed. Reg. 13,769 (Nov. 9, 1945) (the Secretary designates a Judicial Officer).

## III. Procedural History

On May 19, 2023, the Animal and Plant Health Inspection Service ("APHIS") filed a complaint against Manis alleging that he violated the HPA by allowing the entry into a Virginia horse show of a horse he owned while the horse was allegedly sore. JA037–038. While APHIS alleges that the horse was sore, it does not allege that Manis sored the horse, caused the horse to become sore, or otherwise abused the horse. JA037–038. In fact, APHIS does not allege who sored the horse. JA037–038. Manis denied the allegation. JA040–041. On February 21, 2024, USDA ALJ Jill Clifton proposed scheduling the hearing for the week of April 22, 2024. JA046. On February 22, 2024, Manis moved to dismiss the USDA Adjudication on the grounds that the USDA's internal adjudication process is unconstitutionally structured. JA048–059. On February 27, 2024, Manis requested that no hearing be scheduled

given his constitutional challenges and the anticipated filing of this case. JA065. On February 28, 2024, ALJ Clifton refused to stay the case. JA063–064. In light of this refusal, Manis indicated his availability the week of April 29, 2024, for the hearing. JA063. Manis's hearing took place before ALJ Clifton beginning on April 30, 2024. JA088. The USDA Adjudication overall remains ongoing.

On March 1, 2024, Manis filed a Complaint in federal district court seeking injunctive relief from his USDA Adjudication. JA005–030. He raised four claims: (1) USDA's Judicial Officer is making final decisions—a principal officer function—without a principal officer appointment or office, leaving USDA's ALJs improperly supervised; (2) USDA ALJs are unconstitutionally protected from removal by two layers of tenure protection; (3) the Seventh Amendment entitles Manis to a jury trial on the HPA allegation; and (4) Article III requires that the HPA allegation be heard in an Article III court. JA019–028. He moved for a temporary restraining order and preliminary injunction on March 6, 2024. JA031–035.

On April 24, 2024, after oral argument, the district court denied Manis's motion for a preliminary injunction. JA091–113. The district court held that Manis failed to show that he is likely to succeed on the merits of his constitutional claims. JA112. Because the court concluded that Manis failed to show a likelihood of success on the merits, the court did not evaluate the remaining preliminary injunction

factors. JA112. The same day his preliminary injunction motion was denied, April 24, 2024, Manis noticed this appeal. JA114–116.

On April 25, 2024, Manis moved for an injunction pending appeal in advance of his imminent hearing before the USDA ALJ. Doc. 9-1. Defendants were ordered to file a response by 3:00 pm on April 26, 2024, Doc. 10, which they did, Doc. 11. Manis filed a reply on April 27, 2024. Doc. 12. On April 29, 2024, the Court denied Manis's motion in a single sentence order stating that Manis had not satisfied the "four-factor test set forth in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22–24 (2008)." Order, Doc. 13 (4th Cir. Apr. 29, 2024). On May 1, 2024, Manis moved for expedited consideration and proposed an expedited briefing schedule to which Defendants consented. Doc. 15. As of this filing, Manis's Motion for Expedited Consideration remains pending.

## SUMMARY OF THE ARGUMENT

Manis is likely to succeed on the merits of his claims that the USDA Adjudication is unconstitutionally structured. Contrary to the district court's conclusion, USDA's in-house adjudicative process has several structural constitutional problems. USDA's final decision-maker and supervisor of its inferior officer ALJs—the Judicial Officer—functions as a principal officer without a principal officer appointment as required by the Appointments Clause. USDA's ALJs are unconstitutionally shielded from removal by the President with two layers of

tenure protection. Finally, the USDA Adjudication involves private rights and a common law claim that must be heard by a jury in an Article III court.

First, the Judicial Officer's authority to issue final decisions in USDA adjudications violates the Appointments Clause. The Judicial Officer has the authority to issue a final decision in the USDA Adjudication and impose significant penalties on Manis without any review by the Secretary. Given this authority, the Judicial Officer functions as an officer of the United States. But the Judicial Officer unconstitutionally exercises this authority because his responsibilities are inconsistent with his appointment. The Supreme Court recently established that the determinative factor for the officer status of an executive branch adjudicative officer is whether his decisions can be reviewed by a principal officer. *United States v. Arthrex*, 594 U.S. 1, 23 (2021). Because the Judicial Officer's adjudicative decisions cannot be reviewed by the Secretary, the Judicial Officer functions as a principal officer. Yet, he is not appointed by the President and confirmed by the Senate as required by the Appointments Clause—he is appointed by the Secretary.

Even assuming the Judicial Officer is an inferior officer consistent with his appointment, it creates two additional constitutional problems. First, the Judicial Officer cannot exercise any officer-level authority because he does not hold an office created by statute. The Judicial Officer position is entirely a creation of the Secretary. Second, if the Judicial Officer is an inferior officer, USDA's inferior officer ALJs are

not sufficiently supervised by a principal officer. The Secretary does not have sufficient supervisory authority over the ALJs to substitute for the Judicial Officer. Under the Appointments Clause, the Judicial Officer cannot review USDA ALJ decisions and issue final decisions in USDA adjudications without a principal officer appointment.

USDA ALJs are also unconstitutionally protected from removal by two layers of tenure protection. USDA ALJs can only be removed for good cause, which must be determined by the tenure-protected Merit Systems Protection Board ("MSPB"). So, the only control available to the President is policing whether the MSPB's good cause determinations are so unreasonable that they constitute sufficient cause for removal of MSPB members. This detached level of control over USDA ALJs is insufficient for the President to fulfil his Article II responsibility to take care that the laws are faithfully executed.

Even if the Judicial Officer was properly appointed, HPA violations cannot be adjudicated without a jury outside of an Article III court. The Seventh Amendment guarantees the right to a jury trial in all suits at common law. That includes statutory claims that are effectively traditional common law claims. Statutory claims for civil monetary penalties—such as the HPA allegation in the USDA Adjudication—are common law claims for purposes of the Seventh Amendment.

HPA enforcement actions also must be heard in an Article III court because they involve private rights. The HPA prohibits, among other conduct, a horse owner from allowing his horse to be entered into a horse show while sore to prevent unfair competition. This statutory claim is effectively a common law fraud claim against cheating in a horse competition. Such a common law claim is at the core of the judicial power and must be adjudicated in an Article III court.

This Court should remedy the district court's legal error by ordering the entry of a preliminary injunction. The remaining preliminary injunction factors— irreparable injury, the balance of the equities, and the public interest—depend on whether the administrative proceeding violates constitutional guarantees. Because Manis has demonstrated the USDA Adjudication is unconstitutional, a preliminary injunction is vital because he is certain to suffer an irreparable injury by being subjected to the ongoing USDA Adjudication. Moreover, once the USDA Adjudication has concluded there can be no remedy for Manis's claims because he will have lost his right not to endure an unconstitutional adjudication process.

A preliminary injunction of the USDA Adjudication is also in the public interest and will not harm third parties. It is always in the public interest to prevent a constitutional violation. And irrespective of the value of adjudicating HPA violations internally at USDA, the government may not engage in unconstitutional activity.

# ARGUMENT

## I. Standard of Review

To obtain a preliminary injunction, a movant must establish four factors: "(1) that he's likely to succeed on the merits; (2) that he's likely to suffer irreparable harm if preliminary relief isn't granted; (3) that the balance of equities favors him; and (4) that an injunction is in the public interest." *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023). The district court's denial of a preliminary injunction is reviewed for abuse of discretion, "reviewing factual findings for clear error and legal conclusions de novo." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 339 (4th Cir. 2021) (en banc). Where there is a "likely constitutional violation, the irreparable harm factor is satisfied" and the remaining two factors "favor[]" a preliminary injunction. *Id.* at 346. When, as is the case here, a district court does not evaluate all of the factors, "a court of appeals reviewing [a] denial should 'perform [its] own assessment of the factors not addressed by the district court.'" *Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023).

## II. Manis Is Likely to Succeed on the Merits of His Claims

The district court erred in holding that Manis is unlikely to succeed on the merits of his constitutional claims. The Judicial Officer functions as a principal officer despite not being appointed as the Appointments Clause requires. USDA ALJs unconstitutionally enjoy dual-layer tenure protection. And the violation of the

HPA alleged against Manis is effectively a common law claim that must be brought in an Article III court before a jury. The district court's legal error must be reversed.

## A. The Judicial Officer Unconstitutionally Exercises Principal Officer Power

An officer of the United States has two features: (1) he "must occupy a 'continuing' position established by law" and (2) he "'exercis[es] significant authority pursuant to the laws of the United States.'" *Lucia v. SEC*, 585 U.S. 237, 245 (2018). Officers must be appointed to their offices as required by the Appointments Clause. *Id.* at 244. Any officer may be appointed by the President "with the Advice and Consent of the Senate." U.S. CONST. art. II, § 2, cl. 2. "[I]nferior Officers," if Congress so designates, may be appointed by "the President alone," "the Courts of Law," or "the Heads of Departments." *Id.* The test for distinguishing an inferior officer from a principal officer is supervision: "An inferior officer must be 'directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate.'" *United States v. Arthrex*, 594 U.S. 1, 13 (2021).

The Appointments Clause "is among the significant structural safeguards of the constitutional scheme." *Edmond v. United States*, 520 U.S. 651, 659 (1997). The "'clear and effective chain of command'" it creates provides legitimacy to the exercise of Executive Power and ensures "accountability to the public." *Arthrex*, 594

U.S. at 11. The Appointments Clause "was also designed to assure a higher quality of appointments" by requiring appointment by the President *and* confirmation by the Senate unless Congress provides otherwise for an inferior officer. *Edmond*, 520 U.S. at 659–60. Legitimacy, accountability, and quality are all essential for the exercise of the "'significant authority'" for which officers are responsible. *Lucia*, 585 U.S. at 245.

USDA's Judicial Officer functions as an officer of the United States because he "'exercis[es] significant authority.'" *Id.* He "[a]ct[s] as final deciding officer in [USDA] adjudicatory proceedings subject to" the APA. 7 C.F.R. § 2.35. In that capacity, he is responsible for adjudicating the imposition of substantial civil monetary penalties and potentially crippling disqualification orders in HPA cases. *See* 15 U.S.C. § 1825(b) and (c). Such adjudicative authority is sufficiently significant that it must be exercised by an officer. *Arthrex*, 594 U.S. at 13; *Lucia*, 585 U.S. at 247–49. But for the Judicial Officer to properly exercise officer authority, "the nature of [his] responsibilities" must be "consistent with [his] method of appointment." *Arthrex*, 594 U.S. at 13. It is not.

The Judicial Officer position was created by—and its occupants are appointed by—the Secretary. 10 Fed. Reg. 13,769 (Nov. 9, 1945); *About the Judicial Officer*, U.S. Dep't of Agric., https://www.usda.gov/oha/ojo/judicial-officer (last visited May 11, 2024). This method of appointment is inconsistent with his responsibilities

in two ways. First, he issues final decisions in USDA adjudications without the Secretary reviewing those decisions—a principal officer function—but he was not appointed by the President and confirmed by the Senate. *See Arthrex*, 594 U.S. at 14–15. Second, even if the Judicial Officer is an inferior officer, he does not hold an office "established by law." *Lucia*, 585 U.S. at 247. And inferior officer status would leave USDA's ALJs—who are themselves inferior officers—insufficiently supervised in violation of the Appointments Clause. For these reasons, the Judicial Officer is exercising his principal officer authority in violation of the Appointments Clause.

### 1. The Judicial Officer Functions as a Principal Officer Without a Proper Appointment

An officer of the United States is an inferior officer only if he is sufficiently "'directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate.'" *Arthrex*, 594 U.S. at 13. *Arthrex* provides the rubric for evaluating the sufficiency of supervision for an executive branch adjudicative officer. For an officer issuing final adjudicative decisions for the Executive Branch, his decisions must be subject to review by a principal officer. *Id.* at 14–15, 23.

*Arthrex* considered the officer status of administrative patent judges ("APJ") in the Patent and Trademark Office ("PTO"). *Arthrex*, 594 U.S. at 8. APJs were

executive branch adjudicative officers who were appointed as inferior officers by the Secretary of Commerce and issued final decisions for the executive branch in adversarial inter partes patent review proceedings. *Id.* at 8–9. APJs' final decision-making authority was inconsistent with their status as inferior officers because they had the "'power to render a final decision on behalf of the United States' without any [] review by their nominal superior or any other principal officer in the Executive Branch." *Id.* at 14. *Arthrex* explained that in these adjudicative patent proceedings, "[o]nly an officer properly appointed to a principal office may issue a final decision binding the Executive Branch." *Id.* at 23.

*Arthrex* relied on the long history of principal officer review—which was present in "[e]arly congressional statutes" and Supreme Court decisions, and "carried ... into the modern administrative state"—to support its holding. *Id.* at 19. The government acknowledged in *Arthrex* that it "'certainly is the norm' for principal officers to have the capacity to review decisions made by inferior adjudicative officers." *Id*. at 20. Principal officer review is the "traditional rule" and the critical factor in determining whether an adjudicative officer is a principal or inferior officer. *Id.* at 21.

Instead of applying *Arthrex*, the district court applied the earlier *Edmond* decision as a strict three-factor test for inferior officer status. JA100–101. To determine whether judges of the Coast Guard Court of Criminal Appeals were

inferior officers, *Edmond* evaluated whether: (1) the judges were subject to procedural rules or other administrative oversight mechanisms controlled by a superior officer, (2) the judges were removable at will, and (3) the judge's decisions were reviewed by a superior officer such that they could not "render a final decision on behalf of the United States unless permitted to do so by other Executive officers." 520 U.S. at 664–65. The district court reasoned—in error—that this three-part analysis must be strictly applied because *Arthrex* "reaffirm[ed] and appl[ied] the rule from *Edmond*." JA101; (quoting *Arthrex*, 594 U.S. at 27 (Roberts, C.J., plurality opinion)).

Arthrex did not apply *Edmond* as a strict three-factor test for executive branch adjudications. *Arthrex*, 594 U.S. at 13, 23. Both the majority and the dissent in *Arthrex* described the *Edmond* test as the broad principle that "[a]n inferior officer must be 'directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate.'" *Artherx*, 594 U.S. at 13; *id.* at 49 (Thomas, J., dissenting); *see also Seila Law LLC v. CFPB*, 591 U.S. 197, 217 n.3 (2020) ("More recently, we have focused on whether the officer's work is 'directed and supervised' by a principal officer."). So, while *Edmond* remains good law after *Arthrex*, the district court's rigid application of its three factors was unnecessary because the requisite test is more flexible. *Arthrex* applied *Edmond* in the context of executive branch adjudications and in that particular context

established the primacy of principal officer review for determining officer status. *Arthrex*, 594 U.S. at 23.

*Arthrex* and *Edmond* are also aligned on the primacy of principal officer review. *Arthrex*, 594 U.S. at 14–15; *Edmond*, 520 U.S. at 665. *Edmond* explained that "[w]hat is significant" for inferior officer status is that the officer "ha[s] no power to render a final decision on behalf of the United States unless permitted to do so by other Executive officers." 520 U.S. at 665. Building on *Edmond*, *Arthrex* held that APJs were unconstitutionally exercising principal officer power because "[w]hat was 'significant' to the outcome [in *Edmond*]—review by a superior executive officer—is absent here." *Arthrex*, 594 U.S. at 14.

While *Arthrex* declined to establish an "exclusive criterion" for distinguishing between principal and inferior officers, that reservation was for evaluating officers "outside the context of adjudication" where "decisions by inferior officers do not bind the Executive Branch." *Id.* at 23. What concerned the Supreme Court in *Arthrex* was that "Congress ha[d] assigned APJs 'significant authority' in adjudicating the public rights of private parties" *Id.* The only distinction in USDA's HPA adjudications is that one party is the government. *See* 7 C.F.R. § 1.133. But that only heightens the need for the political accountability that comes from principal officer review. *See Arthrex*, 594 U.S. at 20. *Arthrex* is not a jurisprudential cul-de-sac that can be passed by in favor of *Edmond*; it is the rubric for evaluating the status of

executive branch adjudicative officers. *See Arthrex*, 594 U.S. at 23. Inferior adjudicative officers must have their decisions reviewed by a principal officer. *Id.*

### a. The Judicial Officer's Decisions Cannot Be Reviewed by a Principal Officer

The Secretary is barred by the Constitution, a statute, and regulations from reviewing the final adjudicative decisions of the Judicial Officer in HPA cases. 7 U.S.C. § 2204-3; JA101. The Judicial Officer issues the final decision in HPA adjudications, and the respondent must seek judicial review of that decision rather than appeal to the Secretary. 7 C.F.R. §§ 1.145(i), 2.35(a)(1). The statute through which the Secretary delegated this final decision-making authority considers the delegated authority to be "vested by law in the" delegee and cannot be retroactively revoked. 7 U.S.C. § 2204-3. Decisions by the delegee are "considered as having been performed by the Secretary." *Id.* The statutory prohibition on retroactive revocation prevents the Secretary from reviewing a decision of the Judicial Officer once it is made. *Id.* At that point, any effort by the Secretary to change the Judicial Officer's decision effectively revokes the Judicial Officer's authority. *Id.*

Any attempts by the Secretary to intervene in the adjudication process and reverse a decision of the Judicial Officer are also prohibited by the Fifth Amendment's Due Process Clause. *Utica Packing*, 781 F.2d at 78. In *Utica Packing*, the Secretary reversed the Judicial Officer's decision in a Federal Meat Inspection

Act adjudication by revoking the Judicial Officer's authority over that case, reassigning the case to another person in USDA, and then moving for reconsideration. *Id.* at 72, 74. That maneuver denied the defendant his due process right to a fair trial, which exists even in administrative adjudications, because it created a "risk of unfairness" that was "'intolerably high.'" *Id.* at 78. The Court explained that "[t]here is no guarantee of fairness when the one who appoints a judge has the power to remove the judge before the end of proceedings for rendering a decision which displeases the appointer." *Id.* at 78.

The Secretary is also prohibited by regulation from reviewing decisions of the Judicial Officer. 7 C.F.R. §§ 1.139, 1.142(c)(4), 1.145(i), 2.35. Orders of the Judicial Officer "may be regarded ... as final for purposes of judicial review." 7 C.F.R. § 1.145(i). The USDA's rules of procedure do not provide any avenue for the Secretary—or any other principal officer—to review decisions of the Judicial Officer. 7 C.F.R. § 1.130 *et seq.* And the Secretary "is obliged to follow" his established rules of practice. *Ballard v. Comm'r*, 544 U.S. 40, 59 (2005). So, the constitutionality of the USDA Adjudication must be evaluated as it is, not as it might be.

The district court agreed with Manis that "the Secretary cannot retroactively override the Judicial Officer's decisions." JA101. This is consistent with another recent decision on the availability of principal officer review of Judicial Officer

decisions. *McConnell v. USDA*, No. 4:23-CV-24, 2023 WL 5963782, at *4 (E.D. Tenn. Sept. 13, 2023) ("[T]he Judicial Officer's decisions are not reviewable by the Secretary."). Because there is no possibility of principal officer review of the Judicial Officer's final adjudicative decisions, the Judicial Officer functions as a principal officer. *See Arthrex*, 594 U.S. at 14–15.

### b. Removability and Administrative Oversight Provide Insufficient Supervision of the Judicial Officer

Even if the Judicial Officer's status must be analyzed through a strict application of the three *Edmond* factors as the district court did, JA100–101, the Judicial Officer is still insufficiently supervised to be appointed as an inferior officer. The Secretary's administrative oversight and ability to remove the Judicial Officer— the two remaining *Edmond* factors—provide insufficient supervision of the Judicial Officer's adjudicative role to offset the lack of principal officer review. 520 U.S. at 664. The insufficiency of that supervision is evident when the circumstances here are compared to the circumstances in *Edmond* and *Arthrex*.

In *Edmond*, the Coast Guard Court of Criminal Appeals was subject to administrative oversight from the Judge Advocate General, who promulgated the court's procedural rules and developed "'policies and procedure'" for "'review of court-martial cases.'" 520 U.S. at 664. The Judge Advocate General could also remove judges from the Court of Criminal Appeals "without cause." *Id.* Separately,

the Court of Appeals for the Armed Forces—a part of the Executive Branch composed of principal officers—reviewed Court of Criminal Appeal's decisions when the accused was sentenced to death, the Judge Advocate General ordered review, or the accused petitioned for, and the court granted, review. *Id.* at 664–65. So, where principal officers had administrative oversight authority, unrestricted removal authority, and authority to review their adjudicative decisions, the judges of the Court of Criminal Appeals were inferior officers. *Id.* at 666.

In *Arthrex*, the PTO Director exerted "'administrative oversight'" over the APJs by setting their pay, making the decision to initiate inter partes review, selecting the APJs for inter partes review, "promulgat[ing] regulations governing inter partes review, issu[ing] prospective guidance on patentability issues, and designat[ing] past PTAB decisions as 'precedential' for future panels." 594 U.S. at 14. The Director was "the boss, except when it c[ame] to the one thing that [made] the APJs officers exercising 'significant authority' in the first place—their power to issue decisions on patentability." *Id.* APJs could only be removed "for such cause as will promote the efficiency of the service." *Id.* at 17 (quoting 5 U.S.C. § 7513(a)). And the statute providing for inter partes review made the PTAB the "last stop for review within the Executive Branch." *Id.* at 9. This arrangement violated the Appointments Clause. *Id.* at 23. The remedy was to eliminate the restriction on principal officer review, *not* the

removal protection. *Id.* at 24–26 (Roberts, C.J., plurality opinion); *id.* at 44 (opinion of Breyer, J., concurring in part and dissenting in part).

Administrative oversight was present in both *Arthrex* and *Edmond*, yet it was not sufficient supervision on its own in either case. *Edmond*, 520 U.S. at 664–65; *Arthrex*, 594 U.S. at 14–15. *Arthrex* and *Edmond* differed with respect to the presence of removal restrictions. *Edmond*, 520 U.S. at 664; *Arthrex*, 594 U.S. at 17. But in *Arthrex*, where removal was restricted, the Court *left the restriction in place* and eliminated the restriction on principal officer review instead. 594 U.S. at 25–26 (Roberts, C.J., plurality opinion); *id.* at 44 (Breyer, J., concurring in part and dissenting in part). The deciding variable in both cases was principal officer review.

Here, the Judicial Officer is subject to administrative oversight from the Secretary through USDA's Uniform Rules of Practice, 7 C.F.R. § 1.131, and the substantive regulations implementing the HPA, 9 C.F.R. § 11.1 *et seq.*[1] Otherwise, the Secretary's delegation to decide HPA cases "vested by law" this "regulatory function" in the Judicial Officer such that his decisions "shall be considered as having been performed by the Secretary." 7 U.S.C. § 2204-3; 7 C.F.R. § 2.35. And

---

[1] The substantive regulations that implement the HPA and are applied by the Judicial Officer were not originally issued by the Secretary, but by a unit of APHIS—a regulatory creation. *See, e.g.*, 44 Fed. Reg. 25,172, 25,184 (Apr. 27, 1979) (signed by Acting Deputy Administrator, Veterinary Services); *see also* 37 Fed. Reg. 6327 (Mar. 28, 1972); *Vessels in Foreign & Domestic Trades*, 13 Cust. B. & Dec. 76, 77 (1979).

the Judicial Officer decides appeals in USDA adjudications based on the closed record and "matter[s] of which official notice is taken.," 7 C.F.R. § 1.145(i); *see also* 5 U.S.C. § 556(e). He does so "independently" and with "[u]nlimited authority;" "[n]o supervision or direction is received." *In re World Wide Citrus*, 50 Agric. Dec. at 331–32; *In Re: William J. Reinhart & Reinhart Stables*, 59 Agric. Dec. 721, at *26 (U.S.D.A. Nov. 9, 2000) ("[USDA] policy requires that the Judicial Officer render impartial decisions in administrative proceedings."). This is neither sufficient supervision by a principal officer in an adjudication nor determinative of the Judicial Officer's status given that the Court considered administrative oversight to be present in *Edmond*, 520 U.S. at 664, and *Arthrex*, 594 U.S. at 14—where the Director was "the boss" in all respects except for reviewing APJ decisions.

The Judicial Officer is also removable at will by the Secretary and may, in general, have his delegated authority revoked. 7 U.S.C. § 2204-2. But the Judicial Officer's *decisions* cannot be reviewed by the Secretary or another principal officer. *See supra* Part II.A.1.a.

In the district court's view, an officer that is subject to the Secretary's rules of procedure and is removable at will may issue final decisions for the agency without principal officer review of those decisions. JA101–102. The Supreme Court had the opportunity to create that situation in *Arthrex* by striking down the APJs' removal protections instead of the prohibition on principal officer review. 594 U.S. at 24–27

(Roberts, C.J., plurality opinion). But the Court declined to do so, because "review by the Director better reflects the structure of supervision within the PTO and the nature of APJs' duties." *Id.* at 26; *see also id.* at 27 ("[T]he source of the constitutional violation is the restraint on the review authority of the Director."); *id.* at 44 (Breyer, J., concurring in part and dissenting in part).

The structure of USDA adjudications and the nature of the Judicial Officer's duties is substantively the same as inter partes review and the nature of APJs. Like the APJs, the ability of the Judicial Officer to issue adjudicative decisions in USDA enforcement actions is the "one thing" that gives him significant authority. *Id.* at 14. That compels the same result here as the Court reached in *Arthrex*. The lack of principal officer review means the Judicial Officer must be appointed as a principal officer. *See id.* at 14–15, 23.

### c. The Judicial Officer Is Not Appointed as a Principal Officer

The Judicial Officer's principal officer authority is incompatible with his method of appointment. *See Arthrex*, 594 U.S. at 23. The Appointments Clause requires "Officers of the United States" who are not inferior officers to be appointed by the President "with the Advice and Consent of the Senate." U.S. Const. art. II, § 2, cl. 2. But the Judicial Officer is only appointed by the Secretary. *About the Judicial Officer*, U.S. Dep't of Agric., https://www.usda.gov/oha/ojo/judicial-officer (last visited May 11, 2024). Thus, the Judicial Officer is exercising his final decision-

making authority in violation of the Appointments Clause. *See Arthrex*, 594 U.S. at 23.

### 2. The Judicial Officer Does Not Hold an Office Created by Statute

Even if the Judicial Officer functions as an inferior officer, he still cannot exercise that authority because Congress did not create an office for the Judicial Officer. *See Lucia*, 585 U.S. at 247–48. This is the second independent inconsistency between the Judicial Officer's "method of appointment" and the "nature of [his] responsibilities." *Arthrex*, 594 U.S. at 13.

For an office to be "established by Law" pursuant to the Appointments Clause, U.S. CONST. art. II, § 2, cl. 2, it must be "created by statute, down to its 'duties, salary, and means of appointment.'" *Lucia*, 585 U.S. at 247–48; *Burnap v. United States,* 252 U.S. 512, 516–18 (1920). Congress must be clear about those details; for example, simply appropriating money for a specific position is insufficient to establish an office. *Burnap*, 252 U.S. at 517–18. An individual who does not hold a statutorily created office cannot be an officer and consequently cannot exercise officer-level authority. *See Lucia*, 585 U.S. at 247–48.

Longstanding Supreme Court precedent establishes that officers must hold offices specifically created by statute. In 1920, the Supreme Court evaluated whether a landscape architect was an officer for purposes of removability and found that he was not an officer because no statute created his position or "define[d its] duties."

*Burnap*, 252 U.S. at 517. The Court explained that whether someone holds an office or is an employee "is determined by the manner in which Congress has specifically provided for the creation of the several positions, their duties and appointment thereto." *Id.* at 516.

The lack of a statutorily created office is doubly problematic for an inferior officer appointed by a head of department. The Appointments Clause only permits inferior officers to be appointed by a head of department if Congress "vest[ed]" that authority in him "by Law." U.S. CONST. art. II, § 2, cl. 2. Otherwise, even an inferior officer must be appointed by the President and confirmed by the Senate. *Arthrex*, 594 U.S. at 12.

The Judicial Officer is solely a creation of the Secretary of Agriculture, not Congress. 7 C.F.R. § 2.35; 10 Fed. Reg. 13,769. Congress authorized the Secretary to delegate "the whole or any part of any regulatory function" to no more than two "officers or employees" of USDA. 7 U.S.C. § 2204-2. Reorganization Plan No. 2 of 1953 similarly authorizes the Secretary to delegate to "any other officer, or [] any agency or employee" of USDA "any function of the Secretary." Reorganization Plan No. 2 of 1953, 18 Fed. Reg. 3219, 3221 (June 5, 1953), *reprinted as amended in* 5 U.S.C. app. at 145–46. Pursuant to those statutory authorities, the Secretary created the Judicial Officer and delegated to him the authority to "[a]ct as final deciding officer in adjudicatory proceedings subject to" the APA. 7 C.F.R. §§ 2.35, 2.4;

10 Fed. Reg. 13,769. But nothing in section 2204-2 or Reorganization Plan No. 2 of 1953 establishes the "duties, salary, and means of appointment" of the Judicial Officer; the position is not even mentioned. *Lucia*, 585 U.S. at 248; 7 U.S.C. § 2204-2; 18 Fed. Reg. at 3219–21. And the power to designate preexisting officers or employees to exercise delegated authority is distinct from the power to appoint to an office in the first instance, which Congress specifically grants. *See Edmond*, 520 U.S. at 657 (Congress distinguishes between appointments to a new office and assigning to an existing position)

In fact, Congress affirmatively decided *not* to create a new office held by a principal officer with authority to make final adjudicative decisions for USDA when it enacted section 2204-2. *In re World Wide Citrus*, 50 Agric. Dec. at 335–44. When the Schwellenbach Act was initially proposed in the Senate, it included a new office of Second Assistant Secretary of Agriculture that required a presidential appointment and Senate confirmation. *Id.* at 335–36. But the House of Representatives passed a version of the bill that authorized the Secretary to delegate his "quasi-judicial functions to not more than two employees" of a certain civil service rank. *Id.* at 339–40. Congress adopted the House's approach and the Chairman of the House Agriculture Committee explained that the final version of the bill "'eliminate[d] the additional position and require[d] the hearings ... to be conducted before authorities

[then] in the Department.'" *Id.* at 341–44. Congress cannot have established what it explicitly refused to do.

Because the Judicial Officer does not hold an office specifically created by statute, he is an employee who cannot exercise officer-level authority. *Lucia*, 585 U.S. at 244–48; *Burnap,* 252 U.S. at 516–18. At a minimum, the lack of such a statute fails to "vest" the authority to appoint the Judicial Officer in the Secretary. U.S. CONST. art. II, § 2, cl. 2. So, even if the Judicial Officer functions as an inferior officer, he is still appointed in violation of the Appointments Clause. *See Arthrex*, 594 U.S. at 12.

### 3. The ALJs Are Improperly Supervised Inferior Officers

Additionally, if the Judicial Officer is only an inferior officer, that necessarily creates another constitutional problem in USDA's adjudication scheme. The ALJs, whose decisions are reviewed by the Judicial Officer, lack sufficient oversight from a properly appointed officer. *See Arthrex*, 594 U.S. at 13–15.

The USDA ALJs' office and method of appointment are consistent with a role as inferior officers. *See Lucia*, 585 U.S. at 244–248. USDA ALJs are appointed to an office created by statute including their "duties, salary, and means of appointment."; *Lucia*, 585 U.S. at 248; 5 U.S.C. §§ 556–57, 5372, 3105. The Secretary appoints USDA's ALJs in conformance with the Appointments Clause.

*See, e.g.*, *In re: Trimble*, 77 Agric. Dec. at 17; U.S. CONST. art. II, § 2, cl. 2; 5 U.S.C. § 3105 (authorizing agencies to appoint ALJs).

USDA ALJs also exercise significant authority consistent with an officer. *Lucia*, 585 U.S. at 248–49. Like the SEC ALJs in *Lucia*, USDA ALJs oversee adversarial hearings by "examin[ing] witnesses and receiv[ing] evidence," "[a]dminister[ing] oaths and affirmations," "[r]ul[ing] upon motions and requests," "[a]dmit[ing] or exclud[ing] evidence," and maintaining order, including by excluding "contumacious counsel or other persons." 7 C.F.R. § 1.144(c); *Lucia*, 585 U.S. at 248. And absent an appeal, the ALJs' decisions become final. 7 C.F.R. § 2.27(a)(1); *Lucia*, 585 U.S. at 248–49.

What USDA ALJs lack is the necessary supervision from a properly-appointed principal officer. "[I]nferior officer[s] must [also] be 'directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate.'" *Arthrex*, 594 U.S. at 13.

USDA ALJs are supervised through two different individuals: the Judicial Officer and the Secretary. 7 C.F.R. §§ 1.131, 1.145, 2.35. The Judicial Officer is the exclusive avenue for review of USDA ALJs' initial decisions. 7 C.F.R. § 1.145; *see supra* Part II.A.1.a. And the Judicial Officer's decisions are precedential for USDA ALJs. *In re Kenny Compton*, 78 Agric. Dec. at *4. But, according to the district court,

the Judicial Officer was not a principal officer appointed by the President capable of supervising the ALJs. JA101–102.

This supervision structure thus creates a distinct constitutional problem. The Secretary alone does not provide adequate principal officer supervision of USDA ALJs if the Judicial Officer is not a principal officer. *See Arthrex*, 594 U.S. at 14–15. The Secretary's only supervisory authority over USDA ALJs is his administrative oversight through the Uniform Rules of Practice, 7 C.F.R. § 1.131, and the substantive HPA regulations, 9 C.F.R. § 11.1 *et seq*. ALJ pay is established by statute, not the Secretary. 5 U.S.C. § 5372. Additionally, the Secretary, as an "interested person," may not have any ex parte communications with an ALJ about "the merits of [a] proceeding." 7 C.F.R. § 1.151(b).

The Secretary also cannot remove USDA ALJs at will because they are protected by two layers of for-cause removal protection. 5 U.S.C. § 7521(a); 5 U.S.C. § 1202(d). The ALJs are only removable "for good cause established and determined by the Merit Systems Protection Board." 5 U.S.C. § 7521(a). And the members of the MSPB may "be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d). So, this "powerful tool for control" is unavailable to the Secretary. *Edmond*, 520 U.S. at 664.

Most importantly, the Secretary cannot review the initial decisions of USDA ALJs in place of the Judicial Officer because his available method of review violates

the due process guarantees of the Fifth Amendment. *See Utica Packing*, 781 F.2d at 78. The Secretary must have a constitutionally and statutorily permissible means of intervening in an adjudication after the ALJ issues his initial decision before it is appealed to the Judicial Officer for the Secretary to have meaningful review authority. *See Arthrex*, 594 U.S. at 15–16. And those means must be evaluated within the current structure of USDA adjudications in which the Judicial Officer hears appeals and makes final decisions for USDA. 7 C.F.R. §§ 1.145, 2.35. The only statutory means the Secretary possesses to accomplish this is revocation of the Judicial Officer's authority in a particular case before his decision. 7 U.S.C. §§ 2204-2, 2204-3.

The Due Process Clause of the Fifth Amendment does not permit the Secretary to disregard USDA's established adjudication process and intervene at will to remove the Judicial Officer from an ongoing case. *Utica Packing*, 781 F.2d at 78. Due process's "'basic requirement'" of a "'fair trial in a fair tribunal'" "applies to administrative agencies which adjudicate." *Withrow v. Larkin*, 421 U.S. 35, 46 (1975). And the Secretary is "obliged to follow" his established rules of practice when USDA is functioning as a "decisionmaking tribunal[]." *Ballard*, 544 U.S. at 59. That means a "disappointed litigant" cannot replace a judge with *himself* while the proceedings are ongoing because the "risk of unfairness [is] 'intolerably high.'" *Utica Packing*, 781 F.2d at 78. *Utica Packing* involved the Secretary's replacement

of the Judicial Officer with a new judge in a specific case prior to moving for reconsideration of the previous Judicial Officer's adverse decision. *Id.* at 74. But it is equally true that "[a]ll notions of judicial impartiality would be abandoned" if the Secretary could cut out the Judicial Officer on a case-by-case basis—after seeing the ALJ's initial decision—and appoint *himself* as the judge to ensure a desired outcome. *Id.* at 78.

Without the ability to either remove ALJs or review their decisions, the Secretary does not have sufficient authority to supervise the ALJs on his own. *See Arthrex*, 594 U.S. at 24–27 (Roberts, C.J., plurality opinion); *id.* at 44 (Breyer, J., concurring in part and dissenting in part); *Edmond*, 520 U.S. 664–65. Because the Judicial Officer never received a proper appointment as a principal officer, and the Secretary does not provide such adequate supervision, the USDA ALJs lack the required accountability to the President. *See Arthrex*, 594 U.S. at 13.

### B. USDA ALJs Are Unconstitutionally Protected from Removal

The Constitution requires that the President "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3. "'[A]s a general matter,' the Constitution gives the President 'the authority to remove those who assist him in carrying out his duties.'" *Seila Law*, 591 U.S. at 204. But where there are two layers of tenure protection, "[t]he President is stripped of ... his ability to execute the laws"

"by holding his subordinates accountable for their conduct." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 496 (2010).

USDA ALJs "exercise significant executive power" such that the President's removal authority cannot be restricted by two layers of tenure protection. *Id.* at 514; *see also supra* Part II.A.3. USDA ALJs, as inferior officers who manage administrative hearings, "are sufficiently important to executing the laws that the Constitution requires that the President be able to exercise authority over their functions." *Jarkesy v. SEC*, 34 F.4th 446, 464 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 2688 (2023); *see also supra* Part II.A.3. While their function is adjudicatory, it is an "exercise[] of ... the executive Power, for which the President is ultimately responsible." *Arthrex*, 594 U.S. at 17 (quotation marks omitted).

USDA ALJs' two layers of tenure protection through the MSPB unconstitutionally interfere with the President's removal authority. *See Jarkesy*, 34 F.4th at 465; *Walmart, Inc. v. King*, No. CV 623-040, 2024 WL 1258223, at *4 (S.D. Ga. Mar. 25, 2024). USDA ALJs can only be removed for "good cause" as "determined by the [MSPB]," 5 U.S.C. § 7521, and MSPB members can only be removed "for inefficiency, neglect of duty, or malfeasance in office," 5 U.S.C. § 1202(d). The good cause standard prevents an ALJ's removal for reasons that "'constitute [] improper interference'" with the ALJ's "'qualified judicial independence,'" as determined by the MSPB. *See Berlin v. Dep't of Lab.*, 772 F.3d

890, 894 (Fed. Cir. 2014). And when combined with the MSPB's removal protection, the situation constitutes an unconstitutional level of removal protection. *See Jarkesy*, 34 F.4th at 465. Just like in *Free Enterprise Fund*, the President can only intervene if the MSPB's determination of "good cause" is so "unreasonable" it violates Section 1202(d), and thus he lacks the constitutionally necessary level of control over the ALJs. 561 U.S. at 496; *Walmart*, 2024 WL 1258223, at *3.

### C. Manis Is Entitled to a Jury Trial Under the Seventh Amendment

The Seventh Amendment requires that USDA's allegations against Manis be tried before a jury. *See Jarkesy*, 34 F.4th at 452–59. The Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." U.S. CONST. amend. VII. There are two parts to analyzing whether a statutory claim constitutes a suit at common law for purposes of the Seventh Amendment. *First*, the statutory claim must be sufficiently similar to "18th-century actions brought in the courts of England prior to the merger of the courts of law and equity" and provide a legal remedy. *Tull v. United States*, 481 U.S. 412, 417–18 (1987). *Second*, the claim must regard private rights such that it cannot be assigned to a tribunal other than an Article III court.[2]

---

[2] The second factor should be abandoned, and the Seventh Amendment applied to all "Suits at common law" irrespective of the forum to which they are assigned. *See Parsons v. Bedford, Breedlove & Robeson*, 28 U.S. (3 Pet.) 433, 447 (1830). It was

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42, 51 (1989). The allegation against Manis satisfies both parts of the analysis and must be tried before a jury.

### 1. The Allegation Against Manis Is a Common Law Action in Debt That Requires a Jury Trial

Government enforcement actions that seek civil monetary penalties are common law actions that require a jury trial. *Tull*, 481 U.S. at 418–20. The Supreme Court has already settled that civil monetary penalty suits are "a particular species of an action in debt" that were handled in English courts of law and thus require a jury trial. *Id.* At issue in *Tull* was the imposition of civil monetary penalties for violations of the Clean Water Act. *Id.* at 420. Violations of the HPA are also punishable with civil monetary penalties. 15 U.S.C. § 1825(b)(1). So, if the allegation against Manis cannot be adjudicated outside an Article III court, he is entitled to a jury trial. *Tull*, 481 U.S. at 420.

### 2. The HPA Allegation Against Manis Cannot Be Assigned to the Executive Branch

Private rights suits must be litigated in Article III courts with a jury as guaranteed by the Seventh Amendment. *Granfinanciera*, 492 U.S. at 51–52. Private

---

ratified to prohibit Congress from doing exactly what the second factor permits. *See United States v. Wonson*, 28 F. Cas. 745, 750 (C.C.D. Mass. 1812) (Story, J.). Manis acknowledges this argument is foreclosed by Fourth Circuit and Supreme Court precedent. *Atlas Roofing Co., Inc. v. OSHRC*, 430 U.S. 442 (1977); *Sasser v. Adm'r, E.P.A.*, 990 F.2d 127, 130 (4th Cir. 1993). He raises it to explicitly preserve it.

rights matters involve "the liability of one individual to another under the law as defined." *N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 69–70 (1982) (plurality opinion) (quotation marks omitted). Congress is not permitted to "conjure away the Seventh Amendment by mandating that traditional legal claims be ... taken to an administrative tribunal." *Granfinanciera*, 492 U.S. at 52.

On the other hand, actions litigating public rights may be assigned to administrative agencies for adjudication. *Atlas Roofing*, 430 U.S. at 455. Public rights cases are those "in which the Government sues in its sovereign capacity to enforce public rights created by statutes within the power of Congress to enact." *Id.* at 450. That broad and self-referential definition is limited by the circumstances of the case that generated it. *Atlas Roofing* permitted an administrative agency to pursue "a new cause of action, and remedies therefore, unknown to the common law," in a "speedy and expert" agency tribunal. *Id.* at 461. It did not permit Congress to remove any type of enforcement action seeking civil monetary penalties from an Article III court simply by creating a cause of action irrespective of the private rights that are implicated. *See id.* at 458, 461.

The critical question is whether a statute simply "assigns 'traditional legal claims' to an administrative tribunal." *Jarkesy*, 34 F.4th at 453 (quoting *Granfinanciera*, 492 U.S. at 52). This question has become more relevant because of the shift in the Supreme Court's Seventh Amendment analysis from the forum of

the suit to the nature of the claim. *See Granfinanciera*, 492 U.S. at 50–63; *id.* at 79 (White, J., dissenting) (questioning whether *Atlas Roofing* remains good law); *Jarkesy*, 34 F.4th at 453.

Two factors determine whether a case involves public rights rather than a "'traditional legal claim[].'" *Jarkesy*, 34 F.4th at 453. *First*, public rights cases involve a "new cause of action, and remedies" created by Congress that were previously "unknown to the common law, because traditional rights and remedies were inadequate to cope with a manifest public problem." *Id.* (quotation marks omitted). *Second*, the Court must consider whether moving the claim to an Article III court would "go far to dismantle the statutory scheme," "impede swift resolution" of the claim, or whether the claim is "incompatible" with a jury trial. *Id.* at 453, 458 (quotation marks omitted).

Manis is accused of violating a single provision of the HPA: "allowing" as an owner a "horse which is sore" to be "enter[ed] for the purpose of showing or exhibiting in any horse show or horse exhibition." 15 U.S.C. § 1824(2)(D); JA037. A statutory proceeding to enforce this prohibition is "'of the sort traditionally enforced in an action at common law.'" *United States v. McHan*, 345 F.3d 262, 273 (4th Cir. 2003). Not only is it an action for civil monetary penalties, but it is also effectively a common law fraud claim. Manis is entitled to have USDA's claim that

involves private rights adjudicated in an Article III court. *See Jarkesy*, 34 F.4th at 458–59.

A cause of action for fraud is certainly not unknown to the common law. *See Jarkesy*, 34 F.4th at 453–55. It is a quintessential common-law action and has been civilly prosecuted dating back to English common law courts. *Id.* at 453 (citing 3 William Blackstone, Commentaries on the Laws of England *42). The HPA essentially creates a federal statutory prohibition against common-law fraud in walking horse competitions and empowers the USDA to administratively pursue those claims. 15 U.S.C. §§ 1824–25. Fraud "is not a matter that can be pursued only by grace of the other branches." *Stern v. Marshall*, 564 U.S. 462, 493 (2011).

The elements of common-law fraud are "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." *Evaluation Rsch. Corp. v. Alequin*, 439 S.E.2d 387, 390 (Va. 1994); *see also* Restatement (Second) of Torts § 525 (1977). Here, USDA alleged that Manis allowed his horse to be entered into a competition while sore in violation of a statute enacted to prevent sore horses from "compet[ing] unfairly with horses which are not sore." 15 U.S.C. § 1822(2). Horses that compete unfairly harm the other competitors and the competition itself. *See id.* Similar civil fraud suits have been brought by video game companies against players attempting to circumvent anti-cheating

42

measures despite agreeing to a license agreement. *Bungie, Inc. v. L.L.*, No. 2:22-cv-0981, 2023 WL 3318588, at *2 (W.D. Wash. May 9, 2023). So, the HPA allegation against Manis is effectively a common-law fraud claim converted into a regulatory enforcement action. *See Jarkesy*, 34 F.4th at 453–57.

Additionally, the claims against Manis are not "incompatible" with a jury trial nor would a jury trial "go far to dismantle the statutory scheme." *Granfinanciera*, 492 U.S. at 61. The HPA does not create an "expert and inexpensive method for dealing with a class of questions of fact which are particularly suited to examination and determination by [USDA]." *Stern*, 564 U.S. at 494 (quoting *Crowell v. Benson*, 285 U.S. 22, 46 (1932)). USDA does not have a unique adjudication method for HPA violations. *See, e.g.*, 7 C.F.R. § 1.131. The Secretary designated ALJs to hear any APA administrative adjudication for multiple statutes enforced by USDA. 7 C.F.R. § 2.27(a)(1). Additionally, all appeals from initial decisions in USDA adjudicatory proceedings covered by the APA and USDA's procedural rules are decided by the Judicial Officer. 7 C.F.R. §§ 1.145, 2.35(a). And HPA adjudications are conducted under the same rules as the adjudication of claims under no fewer than 38 other statutes. 7 C.F.R. § 1.131. USDA is effectively operating its own general court system. So, the claims against Manis could just as easily be heard in an Article III court before a jury. *See Jarkesy*, 34 F.4th at 455–46.

### D. Article III Requires the HPA Allegation Against Manis to be Tried in an Article III Court

Because APHIS's claim against Manis involves the adjudication of private rights, the entire case must be brought in an Article III court. *Granfinanciera*, 492 U.S. at 53; *see supra* Part II.C.2. Article III vests the judicial power of the United States in "one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. CONST. art. III, § 1. The same private rights analysis for whether a claim must be tried before a jury pursuant to the Seventh Amendment is applicable to whether Congress can "assign adjudication of that cause of action to a non-Article III tribunal." *Granfinanciera*, 492 U.S. at 53. Adjudications of violations of the HPA involve private rights, not public rights. *See supra* Part II.C.2. So, "Congress may not assign [their] adjudication to a specialized non-Article III court lacking 'the essential attributes of the judicial power.'"[3] *Granfinanciera*, 492 U.S. at 53 (quoting *Crowell*, 285 U.S. at 51).

---

[3] Manis expressly preserves the argument that the Supreme Court should revisit its Article III precedents, including *Atlas Roofing*, 430 U.S. 442, and require that administrative actions for civil money penalties and disqualification orders be brought in Article III courts because they concern the core private rights of property and liberty and are cases "in Law and Equity." U.S. CONST. art. III, § 2, cl. 1; *Axon*, 598 U.S. at 198 (Thomas, J., concurring).

### III. This Court Should Order the Entry of an Injunction

Because the district court erred in holding that Manis failed to show a likelihood of success on the merits of his constitutional claims, the ongoing USDA Adjudication should be preliminarily enjoined. The district court did not consider the other three preliminary injunction factors. JA112. "[A] court of appeals reviewing [a] denial should 'perform [its] own assessment of the factors not addressed by the district court.'" *Vitkus*, 79 F.4th at 361 (reversing denial of preliminary injunction and remanding). Where there is a likely constitutional violation, the remaining preliminary injunction factors are satisfied. *Leaders of a Beautiful Struggle*, 2 F.4th at 346.

#### A. Manis Is Irreparably Injured by Being Subjected to the Unconstitutionally Structured USDA Adjudication

"[A] deprivation of a constitutional right, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022). Here, Manis raises constitutional challenges to the structure of USDA's internal adjudication process and is likely to succeed on the merits of those claims. *See supra*, Part II; *Axon*, 598 U.S. at 181–83. Depriving Manis of the protections of a properly structured adjudication denies his constitutional rights. *See Stern*, 564 U.S. at 483. The right to avoid such an injury is similar to the right "'not

to stand trial' or face other legal processes" that the Supreme Court has protected in immunity cases. *Axon*, 598 U.S. at 192.

Manis's injury—being subjected "to an unconstitutionally structured decisionmaking process"—is ongoing and certain. *Axon*, 598 U.S. at 191–92; JA080–081. And that irreparable injury will continue until the Judicial Officer issues a final decision for USDA. This injury "cannot be undone" and will be "impossible to remedy once the proceeding is over." *Axon*, 598 U.S. at 191. Injuries that "'cannot be undone'" are irreparable. *Sierra Club v. United States Army Corps of Engineers*, 981 F.3d 251, 264 (4th Cir. 2020). So, the USDA Adjudication must be stayed now to stop the injury Manis is suffering each and every day, JA081, and to preserve his ability to obtain relief on his constitutional claims before the USDA Adjudication ends. Since Manis is likely to succeed on the merits of his constitutional claims, "the irreparable harm factor is satisfied." *Leaders of a Beautiful Struggle*, 2 F.4th at 346; *see also supra* Part II.

## B. A Preliminary Injunction Is in the Public Interest

The final two factors, the balance of the equities and the public interest, "'merge when the Government is the opposing party.'" *Miranda*, 34 F.4th at 365. When there is a likely constitutional violation, as there is here, these merged factors are satisfied because USDA "is in no way harmed by issuance of a preliminary injunction which prevents [it] from" using an adjudication process "likely to be

found unconstitutional" and "the public interest favors protecting constitutional rights." *Leaders of a Beautiful Struggle*, 2 F.4th at 346. An injunction will not cause substantial harm to others here because, "[i]f anything, the system is improved by such an injunction." *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013).

To the extent there are practical concerns for the HPA from an injunction, they fall away because "our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 766 (2021). Additionally, given that roughly two years have already passed since the conduct that is the subject of the USDA Adjudication, JA037, a short additional delay while Manis's claims are fully adjudicated will harm neither Defendants nor the public. *See West Virginia v. EPA*, 90 F.4th 323, 332 (4th Cir. 2024) (a few additional months delay after a three-year delay in stricter air quality standards favors stay). Because Manis is likely to succeed on the merits of his constitutional challenges, *see supra* Part II, a preliminary injunction is in the public interest, *see Leaders of a Beautiful Struggle*, 2 F.4th at 346.

## CONCLUSION

For the forgoing reasons, the district court's denial of a preliminary injunction should be reversed, and this Court should order entry of an injunction of the USDA Adjudication pending a final judgment on the merits.

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Oral argument is preferred. This case presents constitutional issues concerning the structure of USDA internal adjudications. Given the significance of Manis's constitutional claims for all parties, oral argument would help the court to decide whether a preliminary injunction of USDA's adjudication process is warranted. However, because Manis needs prompt relief to avoid any further irreparable injury, Manis is willing to forgo oral argument if that is necessary to obtain an expedited decision before the USDA Adjudication ends.

DATED: May 15, 2024.

Respectfully submitted,

/s/ *Joshua M. Robbins*
JOSHUA M. ROBBINS
ALLISON D. DANIEL
PACIFIC LEGAL FOUNDATION
3100 Clarendon Blvd.
Suite 1000
Arlington, VA 22201
(202) 945-9524
JRobbins@pacificlegal.org
ADaniel@ pacificlegal.org

THOMAS B. KAKASSY
P.O. Box 2436
Gastonia, NC 28053
(704) 867-1820
Tom@kakassylaw.com

*Counsel for Appellant*

**CERTIFICATE OF COMPLIANCE**

This motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 11,064 words excluding the parts exempt by Federal Rule of Appellate Procedure 32(f).

This motion complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

DATED: May 15, 2024.

/s/ *Joshua M. Robbins*
JOSHUA M. ROBBINS
*Counsel for Appellant*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 15, 2024, I electronically transmitted the foregoing document to the Clerk of Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system and transmittal of a Notice of Docket Activity was sent to counsel of record.

s/ *Joshua M. Robbins*
JOSHUA M. ROBBINS

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

JOE MANIS,

*Appellant,*

---v.---

U.S. DEPARTMENT OF AGRICULTURE; THOMAS JAMES VILSACK, in his official capacity as the Secretary of Agriculture; MICHAEL WATSON, in his official capacity as Administrator of the Animal and Plant Health Inspection Service,

*Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CASE NO. 1:24-CV-00175-WO-JLW

**ADDENDUM TO APPELLANT'S OPENING BRIEF**

THOMAS B. KAKASSY
P.O. Box 2436
Gastonia, NC 28053
Telephone: (704) 867-1820
Fax: (704) 867-1820
Tom@kakassylaw.com

*Counsel for Appellant*

JOSHUA M. ROBBINS
ALLISON D. DANIEL
PACIFIC LEGAL FOUNDATION
3100 Clarendon Blvd., Suite 1000
Arlington, Virginia 22201
Telephone: (202) 945-9524
JRobbins@pacificlegal.org
ADaniel@pacificlegal.org

# Table of Contents

| Document | Page |
|---|---|
| 5 U.S.C. § 1202 | ADD001 |
| 5 U.S.C. § 7521 | ADD003 |
| 7 U.S.C. § 2204-2 | ADD004 |
| 7 U.S.C. § 2204-3 | ADD004 |
| 15 U.S.C. § 1824 | ADD006 |
| 15 U.S.C. § 1825 | ADD007 |
| 7 C.F.R. § 1.145 | ADD010 |
| 7 C.F.R. § 2.35 | ADD012 |



## Statutory Notes and Related Subsidiaries

### EFFECTIVE DATE OF 1989 AMENDMENT

Pub. L. 101–12, §11, Apr. 10, 1989, 103 Stat. 35, provided that: ''This Act and the amendments made by this Act [see Short Title of 1989 Amendment note below] shall take effect 90 days following the date of enactment of this Act [Apr. 10, 1989].''

### EFFECTIVE DATE

Subchapter effective 90 days after Oct. 13, 1978, see section 907 of Pub. L. 95–454, set out as an Effective Date of 1978 Amendment note under section 1101 of this title.

### SHORT TITLE OF 1989 AMENDMENT

Pub. L. 101–12, §1, Apr. 10, 1989, 103 Stat. 16, provided that: ''This Act [enacting subchapters II and III of this chapter and section 3352 of this title, amending this section and sections 1202 to 1206, 1209, 1211, 2302, 2303, 3393, 7502, 7512, 7521, 7542, 7701, and 7703 of this title and section 4139 of Title 22, Foreign Relations and Intercourse, repealing sections 1207 and 1208 of this title, and enacting provisions set out as notes under this section and sections 1211 and 5509 of this title] may be cited as the 'Whistleblower Protection Act of 1989'.''

### SAVINGS PROVISION

Pub. L. 101–12, §7, Apr. 10, 1989, 103 Stat. 34, provided that:

''(a) ORDERS, RULES, AND REGULATIONS.—All orders, rules, and regulations issued by the Merit Systems Protection Board or the Special Counsel before the effective date of this Act [see Effective Date of 1989 Amendment note above] shall continue in effect, according to their terms, until modified, terminated, superseded, or repealed.

''(b) ADMINISTRATIVE PROCEEDINGS.—No provision of this Act [see Short Title of 1989 Amendment note above] shall affect any administrative proceeding pending at the time such provisions take effect. Orders shall be issued in such proceedings, and appeals shall be taken therefrom, as if this Act had not been enacted.

''(c) SUITS AND OTHER PROCEEDINGS.—No suit, action, or other proceeding lawfully commenced by or against the members of the Merit Systems Protection Board, the Special Counsel, or officers or employees thereof, in their official capacity or in relation to the discharge of their official duties, as in effect immediately before the effective date of this Act [see Effective Date of 1989 Amendment note above], shall abate by reason of the enactment of this Act. Determinations with respect to any such suit, action, or other proceeding shall be made as if this Act had not been enacted.''

### WHISTLEBLOWER PROTECTION; CONGRESSIONAL STATEMENT OF FINDINGS AND PURPOSE

Pub. L. 101–12, §2, Apr. 10, 1989, 103 Stat. 16, provided that:

''(a) FINDINGS.—The Congress finds that—

''(1) Federal employees who make disclosures described in section 2302(b)(8) of title 5, United States Code, serve the public interest by assisting in the elimination of fraud, waste, abuse, and unnecessary Government expenditures;

''(2) protecting employees who disclose Government illegality, waste, and corruption is a major step toward a more effective civil service; and

''(3) in passing the Civil Service Reform Act of 1978 [Pub. L. 95–454, see Tables for classification], Congress established the Office of Special Counsel to protect whistleblowers (those individuals who make disclosures described in such section 2302(b)(8)) from reprisal.

''(b) PURPOSE.—The purpose of this Act [see Short Title of 1989 Amendment note above] is to strengthen and improve protection for the rights of Federal employees, to prevent reprisals, and to help eliminate wrongdoing within the Government by—

''(1) mandating that employees should not suffer adverse consequences as a result of prohibited personnel practices; and

''(2) establishing—

''(A) that the primary role of the Office of Special Counsel is to protect employees, especially whistleblowers, from prohibited personnel practices;

''(B) that the Office of Special Counsel shall act in the interests of employees who seek assistance from the Office of Special Counsel; and

''(C) that while disciplining those who commit prohibited personnel practices may be used as a means by which to help accomplish that goal, the protection of individuals who are the subject of prohibited personnel practices remains the paramount consideration.''

### TERMS OF OFFICE OF MEMBERS

Pub. L. 95–454, title II, §202(b), Oct. 13, 1978, 92 Stat. 1131, provided that: ''Any term of office of any member of the Merit Systems Protection Board serving on the effective date of this Act [see Effective Date of 1978 Amendment note set out under section 1101 of this title] shall continue in effect until the term would expire under section 1102 of title 5, United States Code, as in effect immediately before the effective date of this Act, and upon expiration of the term, appointments to such office shall be made under sections 1201 and 1202 of title 5, United States Code (as added by this section).''

## § 1202. Term of office; filling vacancies; removal

(a) The term of office of each member of the Merit Systems Protection Board is 7 years.

(b) A member appointed to fill a vacancy occurring before the end of a term of office of the member's predecessor serves for the remainder of that term. Any appointment to fill a vacancy is subject to the requirements of section 1201. Any new member serving only a portion of a seven-year term in office may continue to serve until a successor is appointed and has qualified, except that such member may not continue to serve for more than one year after the date on which the term of the member would otherwise expire, unless reappointed.

(c) Any member appointed for a 7-year term may not be reappointed to any following term but may continue to serve beyond the expiration of the term until a successor is appointed and has qualified, except that such member may not continue to serve for more than one year after the date on which the term of the member would otherwise expire under this section.

(d) Any member may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office.

(Added Pub. L. 95–454, title II, §202(a), Oct. 13, 1978, 92 Stat. 1122; amended Pub. L. 100–202, §101(m) [title VI, §620], Dec. 22, 1987, 101 Stat. 1329–390, 1329–427; Pub. L. 101–12, §3(a)(2), (3), Apr. 10, 1989, 103 Stat. 17.)

### Editorial Notes

#### AMENDMENTS

1989—Pub. L. 101–12, §3(a)(2), substituted a semicolon for the comma after ''office'' in section catchline.

Subsec. (b). Pub. L. 101–12, §3(a)(3), substituted ''the member's'' for ''his'' in first sentence and struck out ''of this title'' after ''section 1201'' in second sentence.

1987—Subsec. (b). Pub. L. 100–202 inserted provision permitting any new member serving portion of seven-year term to continue serving until successor is appointed and has qualified, with exception limiting duration of such service.

Statutory Notes and Related Subsidiaries

EFFECTIVE DATE OF 1989 AMENDMENT

Amendment by Pub. L. 101–12 effective 90 days following Apr. 10, 1989, see section 11 of Pub. L. 101–12, set out as a note under section 1201 of this title.

## § 1203. Chairman; Vice Chairman

(a) The President shall from time to time appoint, by and with the advice and consent of the Senate, one of the members of the Merit Systems Protection Board as the Chairman of the Board. The Chairman is the chief executive and administrative officer of the Board.

(b) The President shall from time to time designate one of the members of the Board as Vice Chairman of the Board. During the absence or disability of the Chairman, or when the office of Chairman is vacant, the Vice Chairman shall perform the functions vested in the Chairman.

(c) During the absence or disability of both the Chairman and the Vice Chairman, or when the offices of Chairman and Vice Chairman are vacant, the remaining Board member shall perform the functions vested in the Chairman.

(Added Pub. L. 95–454, title II, §202(a), Oct. 13, 1978, 92 Stat. 1122; amended Pub. L. 101–12, §3(a)(4), (5), Apr. 10, 1989, 103 Stat. 17.)

### Editorial Notes

AMENDMENTS

1989—Subsec. (a). Pub. L. 101–12, §3(a)(4), struck out the comma after ''time'' in first sentence.

Subsec. (c). Pub. L. 101–12, §3(a)(5), substituted ''the Chairman and the Vice Chairman'' for ''the Chairman and Vice Chairman'' after ''both''.

Statutory Notes and Related Subsidiaries

EFFECTIVE DATE OF 1989 AMENDMENT

Amendment by Pub. L. 101–12 effective 90 days following Apr. 10, 1989, see section 11 of Pub. L. 101–12, set out as a note under section 1201 of this title.

## § 1204. Powers and functions of the Merit Systems Protection Board

(a) The Merit Systems Protection Board shall—

(1) hear, adjudicate, or provide for the hearing or adjudication, of all matters within the jurisdiction of the Board under this title, chapter 43 of title 38, or any other law, rule, or regulation, and, subject to otherwise applicable provisions of law, take final action on any such matter;

(2) order any Federal agency or employee to comply with any order or decision issued by the Board under the authority granted under paragraph (1) of this subsection and enforce compliance with any such order;

(3) conduct, from time to time, special studies relating to the civil service and to other merit systems in the executive branch, and report to the President and to the Congress as to whether the public interest in a civil service free of prohibited personnel practices is being adequately protected; and

(4) review, as provided in subsection (f), rules and regulations of the Office of Personnel Management.

(b)(1) Any member of the Merit Systems Protection Board, any administrative law judge appointed by the Board under section 3105 of this title, and any employee of the Board designated by the Board may administer oaths, examine witnesses, take depositions, and receive evidence.

(2) Any member of the Board, any administrative law judge appointed by the Board under section 3105, and any employee of the Board designated by the Board may, with respect to any individual—

(A) issue subpoenas requiring the attendance and presentation of testimony of any such individual, and the production of documentary or other evidence from any place in the United States, any territory or possession of the United States, the Commonwealth of Puerto Rico, or the District of Columbia; and

(B) order the taking of depositions from, and responses to written interrogatories by, any such individual.

(3) Witnesses (whether appearing voluntarily or under subpoena) shall be paid the same fee and mileage allowances which are paid subpoenaed witnesses in the courts of the United States.

(c) In the case of contumacy or failure to obey a subpoena issued under subsection (b)(2)(A) or section 1214(b), upon application by the Board, the United States district court for the district in which the person to whom the subpoena is addressed resides or is served may issue an order requiring such person to appear at any designated place to testify or to produce documentary or other evidence. Any failure to obey the order of the court may be punished by the court as a contempt thereof.

(d) A subpoena referred to in subsection (b)(2)(A) may, in the case of any individual outside the territorial jurisdiction of any court of the United States, be served in such manner as the Federal Rules of Civil Procedure prescribe for service of a subpoena in a foreign country. To the extent that the courts of the United States can assert jurisdiction over such individual, the United States District Court for the District of Columbia shall have the same jurisdiction to take any action respecting compliance under this subsection by such individual that such court would have if such individual were personally within the jurisdiction of such court.

(e)(1)(A) In any proceeding under subsection (a)(1), any member of the Board may request from the Director of the Office of Personnel Management an advisory opinion concerning the interpretation of any rule, regulation, or other policy directive promulgated by the Office of Personnel Management.

(B)(i) The Merit Systems Protection Board may, during an investigation by the Office of Special Counsel or during the pendency of any proceeding before the Board, issue any order which may be necessary to protect a witness or other individual from harassment, except that an agency (other than the Office of Special Counsel) may not request any such order with regard to an investigation by the Office of Special Counsel from the Board during such investigation.



rial that is relied on to support the reasons given in the notice for the proposed action.

(B) ANSWER AND EVIDENCE.—

(i) IN GENERAL.—A supervisor who receives notice under subparagraph (A) may, not later than 14 days after the date on which the supervisor receives the notice, submit an answer and furnish evidence in support of that answer.

(ii) NO EVIDENCE FURNISHED; INSUFFICIENT EVIDENCE FURNISHED.—If, after the end of the 14-day period described in clause (i), a supervisor does not furnish any evidence as described in that clause, or if the head of the agency in which the supervisor is employed determines that the evidence furnished by the supervisor is insufficient, the head of the agency shall carry out the action proposed under subparagraph (A) or (B) of paragraph (1), as applicable.

(C) SCOPE OF PROCEDURES.—An action carried out under this section—

(i) except as provided in clause (ii), shall be subject to the same requirements and procedures, including those with respect to an appeal, as an action under section 7503, 7513, or 7543; and

(ii) shall not be subject to—

(I) paragraphs (1) and (2) of section 7503(b);

(II) paragraphs (1) and (2) of subsection (b) and subsection (c) of section 7513; and

(III) paragraphs (1) and (2) of subsection (b) and subsection (c) of section 7543.

(3) NON-DELEGATION.—If the head of an agency is responsible for determining whether a supervisor has committed a prohibited personnel action for purposes of paragraph (1), the head of the agency may not delegate that responsibility.

(Added Pub. L. 115–91, div. A, title X, § 1097(e)(1)(B), Dec. 12, 2017, 131 Stat. 1621.)

### Editorial Notes

PRIOR PROVISIONS

A prior section 7515, Pub. L. 115–73, title I, § 104(a), Oct. 26, 2017, 131 Stat. 1236, related to discipline of supervisors based on retaliation against whistleblowers, prior to repeal by Pub. L. 115–91, div. A, title X, § 1097(e)(1)(A), Dec. 12, 2017, 131 Stat. 1621.

## SUBCHAPTER III—ADMINISTRATIVE LAW JUDGES

### Editorial Notes

AMENDMENTS

1978—Pub. L. 95–454, title II, § 204(a), Oct. 13, 1978, 92 Stat. 1137, substituted "ADMINISTRATIVE LAW JUDGES" for "HEARING EXAMINERS" in subchapter heading.

## § 7521. Actions against administrative law judges

(a) An action may be taken against an administrative law judge appointed under section 3105 of this title by the agency in which the administrative law judge is employed only for good cause established and determined by the Merit Systems Protection Board on the record after opportunity for hearing before the Board.

(b) The actions covered by this section are—

(1) a removal;

(2) a suspension;

(3) a reduction in grade;

(4) a reduction in pay; and

(5) a furlough of 30 days or less;

but do not include—

(A) a suspension or removal under section 7532 of this title;

(B) a reduction-in-force action under section 3502 of this title; or

(C) any action initiated under section 1215 of this title.

(Added Pub. L. 95–454, title II, § 204(a), Oct. 13, 1978, 92 Stat. 1137; amended Pub. L. 101–12, § 9(a)(2), Apr. 10, 1989, 103 Stat. 35.)

### Editorial Notes

PRIOR PROVISIONS

A prior section 7521, Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 528; Pub. L. 95–251, § 2(a)(1), Mar. 27, 1978, 92 Stat. 183, related to removal of an administrative law judge appointed under section 3105 of this title, prior to repeal by Pub. L. 95–454, § 204(a).

AMENDMENTS

1989—Subsec. (b)(C). Pub. L. 101–12 substituted "1215" for "1206".

### Statutory Notes and Related Subsidiaries

EFFECTIVE DATE OF 1989 AMENDMENT

Amendment by Pub. L. 101–12 effective 90 days following Apr. 10, 1989, see section 11 of Pub. L. 101–12, set out as a note under section 1201 of this title.

EFFECTIVE DATE

Section effective 90 days after Oct. 13, 1978, see section 907 of Pub. L. 95–454, set out as an Effective Date of 1978 Amendment note under section 1101 of this title.

## SUBCHAPTER IV—NATIONAL SECURITY

## § 7531. Definitions

For the purpose of this subchapter, "agency" means—

(1) the Department of State;

(2) the Department of Commerce;

(3) the Department of Justice;

(4) the Department of Defense;

(5) a military department;

(6) the Coast Guard;

(7) the Atomic Energy Commission;

(8) the National Aeronautics and Space Administration; and

(9) such other agency of the Government of the United States as the President designates in the best interests of national security.

The President shall report any designation to the Committees on the Armed Services of the Congress.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 528.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 22–3. | Aug. 26, 1950, ch. 823, § 3, 64 Stat. 477. |

cative inspections and to reduce Government costs, while maintaining aircraft, passenger, and pilot safety standards, specifications and procedures currently required by the Department and the Forest Service.

"(2) EXPANSION OF POLICY.—As part of the review, the Secretaries shall examine the feasibility and desirability of applying this policy on a Government-wide basis.

"(3) SUBMISSION OF RESULTS.—Not later than one year after the date of the implementation of the policy, the Secretary of Agriculture shall submit to Congress the results of the review, including any recommendations that the Secretary considers appropriate."

### Executive Documents

#### TRANSFER OF FUNCTIONS

Functions of all officers, agencies, and employees of Department of Agriculture transferred, with certain exceptions, to Secretary of Agriculture by 1953 Reorg. Plan No. 2, §1, eff. June 4, 1953, 18 F.R. 3219, 67 Stat. 633, set out as a note under section 2201 of this title.

Functions of Secretary of Agriculture administered through Bureau of Biological Survey relating to conservation of wildlife, game, and migratory birds transferred to Secretary of the Interior by 1939 Reorg. Plan No. II, §4(f), eff. July 1, 1939, 4 F.R. 2731, 53 Stat. 1433, set out in the Appendix to Title 5, Government Organization and Employees.

Delegation of authority to Secretary with respect to nation's food program during war emergency, see Ex. Ord. No. 9280, paraphrased as a note under section 452 of this title.

#### EMERGENCY PREPAREDNESS FUNCTIONS

For assignment of certain emergency preparedness functions to Secretary of Agriculture, see Parts 1, 2, and 3 of Ex. Ord. No. 12656, Nov. 18, 1988, 53 F.R. 47491, set out as a note under section 5195 of Title 42, The Public Health and Welfare.

#### ORDER OF SUCCESSION

For order of succession during any period when both Secretary and Deputy Secretary of Agriculture are unable to perform functions and duties of office of Secretary, see Ex. Ord. No. 13542, May 13, 2010, 75 F.R. 27921, listed in a table under section 3345 of Title 5, Government Organization and Employees.

### § 2204–1. Delegation of regulatory functions of Secretary of Agriculture; definitions

As used in sections 2204–1 to 2204–5 of this title—

(a) The term "regulatory order" means an order, marketing agreement, standard, permit, license, registration, suspension or revocation of a permit, license, or registration, certificate, award, rule or regulation, if it has the force and effect of law, and if it may be made, prescribed, issued, or promulgated only after notice and hearing or opportunity for hearing have been given.

(b) The term "regulatory function" means the making, prescribing, issuing, or promulgating of a regulatory order; and includes (1) determining whether such making, prescribing, issuing, or promulgating is authorized or required by law, and (2) any action which is required or authorized to be performed before, after, or in connection with, such determining, making, prescribing, issuing, or promulgating.

(Apr. 4, 1940, ch. 75, § 1, 54 Stat. 81.)

### Editorial Notes

#### CODIFICATION

Section was formerly classified to section 450c of this title prior to editorial reclassification and renumbering as this section, and to section 516a of Title 5 prior to the general revision and enactment of Title 5, Government Organization and Employees, by Pub. L. 89–554, § 1, Sept. 6, 1966, 80 Stat. 378.

### § 2204–2. Delegation of regulatory functions to designated employees; status of employees; number; revocation of delegation

Whenever the Secretary of Agriculture deems that the delegation of the whole or any part of any regulatory function which the Secretary is, now or after April 4, 1940, required or authorized to perform will result in the more expeditious discharge of the duties of the Department of Agriculture, he is authorized to make such delegation to any officer or employee designated under this section. The Secretary is authorized to designate officers or employees of the Department to whom functions may be delegated under this section and to assign appropriate titles to such officers or employees. There shall not be in the Department at any one time more than two officers or employees designated under this section and vested with a regulatory function or part thereof delegated under this section. The Secretary may at any time revoke the whole or any part of a delegation or designation made by him under this section.

(Apr. 4, 1940, ch. 75, § 2, 54 Stat. 81; Pub. L. 89–554, § 8(a), Sept. 6, 1966, 80 Stat. 632, 650.)

### Editorial Notes

#### CODIFICATION

Section was formerly classified to section 450d of this title prior to editorial reclassification and renumbering as this section, and to section 516b of Title 5 prior to the general revision and enactment of Title 5, Government Organization and Employees, by Pub. L. 89–554, § 1, Sept. 6, 1966, 80 Stat. 378.

#### AMENDMENTS

1966—Pub. L. 89–554 repealed third sentence which related to grade of a position. See section 5109 of Title 5, Government Organization and Employees.

### § 2204–3. Authority of designated employees; retroactive revocation of delegation

Whenever a delegation is made under section 2204–2 of this title, all provisions of law shall be construed as if the regulatory function or the part thereof delegated had (to the extent of the delegation) been vested by law in the individual to whom the delegation is made, instead of in the Secretary of Agriculture. A revocation of delegation shall not be retroactive, and each regulatory function or part thereof performed (within the scope of the delegation) by such individual prior to the revocation shall be considered as having been performed by the Secretary.

(Apr. 4, 1940, ch. 75, § 3, 54 Stat. 82.)

### Editorial Notes

#### CODIFICATION

Section was formerly classified to section 450e of this title prior to editorial reclassification and renumbering

as this section, and to section 516c of Title 5 prior to the general revision and enactment of Title 5, Government Organization and Employees, by Pub. L. 89–554, §1, Sept. 6, 1966, 80 Stat. 378.

## § 2204–4. Delegation of functions under other laws as unaffected

The provisions of section 2204–2 of this title shall not be deemed to prohibit the delegation, under authority of any other provision of law, of the whole or any part of any regulatory function or other function to any officer or employee of the Department of Agriculture.

(Apr. 4, 1940, ch. 75, §4, 54 Stat. 82.)

### Editorial Notes

#### Codification

Section was formerly classified to section 450f of this title prior to editorial reclassification as this section, and to section 516d of Title 5 prior to the general revision and enactment of Title 5, Government Organization and Employees, by Pub. L. 89–554, §1, Sept. 6, 1966, 80 Stat. 378.

## § 2204–5. Authorization of appropriations for cooperative research projects

There is authorized to be appropriated such sums as may be necessary to carry out the purposes of sections 2204–1 to 2204–5 of this title.

(Apr. 4, 1940, ch. 75, §5, 54 Stat. 82.)

### Editorial Notes

#### Codification

Section was formerly classified to section 450g of this title prior to editorial reclassification as this section, and to section 516e of Title 5 prior to the general revision and enactment of Title 5, Government Organization and Employees, by Pub. L. 89–554, §1, Sept. 6, 1966, 80 Stat. 378.

## § 2204a. Rural development; utilization of non-Federal offices; location of field units; interchange of personnel and facilities

The Secretary of Agriculture shall utilize to the maximum extent practicable State, regional, district, county, local, or other Department of Agriculture offices to enhance rural development, and shall to the maximum extent practicable provide directly, or, in the case of agencies outside of the Department of Agriculture, through arrangements with the heads of such agencies, for—

(1) the location of all field units of the Federal Government concerned with rural development in the appropriate Department of Agriculture offices covering the geographical areas most similar to those covered by such field units, and

(2) the interchange of personnel and facilities in each such office to the extent necessary or desirable to achieve the most efficient utilization of such personnel and facilities and provide the most effective assistance in the development of rural areas in accordance with State rural development plans.

(Pub. L. 92–419, title VI, §603(c), Aug. 30, 1972, 86 Stat. 675; Pub. L. 96–355, §4(5), Sept. 24, 1980, 94 Stat. 1174.)

### Editorial Notes

#### Amendments

1980—Pub. L. 96–355 struck out designation for former par. (1) and, in such par., redesignated former subpars. (A) and (B) as pars. (1) and (2), respectively, and struck out former par. (2) which related to contents of report submitted under section 2204(b) of this title.

### Statutory Notes and Related Subsidiaries

#### Effective Date of 1980 Amendment

Amendment by Pub. L. 96–355 effective Oct. 1, 1980, see section 10 of Pub. L. 96–355, set out as an Effective Date note under section 2204b of this title.

#### Transfer of Functions

Powers, duties, and assets of agencies, offices, and other entities within Department of Agriculture relating to rural development functions transferred to Rural Development Administration by section 2302(b) of Pub. L. 101–624.

## § 2204b. Rural development policy

### (a) Coordination of nationwide rural development program using services of executive branch departments and agencies and State and local governments

The Secretary of Agriculture shall provide leadership within the executive branch for, and shall assume responsibility for coordinating, a nationwide rural development program using the services of executive branch departments and agencies, including, but not limited to, the agencies, bureaus, offices, and services of the Department of Agriculture, in coordination with rural development programs of State and local governments.

### (b) Policy development; systematic review of Federal programs; access to information; development of process to receive and assess needs, goals, etc.; cooperative agreements to improve Federal programs affecting rural areas; public hearings and comments

(1) The Secretary shall conduct a systematic review of Federal programs affecting rural areas to (A) determine whether such areas are benefiting from such programs in an equitable proportion to the benefits received by urban areas and (B) identify any factors that may restrict accessibility to such programs in rural areas or limit participation in such programs.

(2) Subject to the Privacy Act of 1974 [5 U.S.C. 552a], the Secretary may secure directly from any Federal department or agency information necessary to carry out the Secretary's duties under this section. Upon request of the Secretary under this paragraph, the head of any such Federal department or agency shall furnish such information to the Secretary.

(3) The Secretary shall develop a process through which multistate, State, substate, and local rural development needs, goals, objectives, plans, and recommendations can be received and assessed on a continuing basis. Such process may include the use of those rural development experts, advisors, and consultants that the Secretary deems appropriate, as well as the establishment of temporary advisory committees under the terms of chapter 10 of title 5.

(4) Cooperative agreements.—



Editorial Notes

AMENDMENTS

1976—Pub. L. 94–360, among other changes, inserted findings stating that all horses subject to regulation under this chapter are either in interstate or foreign commerce or substantially affect interstate or foreign commerce, and that regulation by the Secretary is appropriate to eliminate burdens upon commerce.

## § 1823. Horse shows and exhibitions

### (a) Disqualification of horses

The management of any horse show or horse exhibition shall disqualify any horse from being shown or exhibited (1) which is sore or (2) if the management has been notified by a person appointed in accordance with regulations under subsection (c) or by the Secretary that the horse is sore.

### (b) Prohibited activities

The management of any horse sale or auction shall prohibit the sale or auction or exhibition for the purpose of sale of any horse (1) which is sore or (2) if the management has been notified by a person appointed in accordance with regulations under subsection (c) or by the Secretary that the horse is sore.

### (c) Appointment of inspectors; manner of inspections

The Secretary shall prescribe by regulation requirements for the appointment by the management of any horse show, horse exhibition, or horse sale or auction of persons qualified to detect and diagnose a horse which is sore or to otherwise inspect horses for the purposes of enforcing this chapter. Such requirements shall prohibit the appointment of persons who, after notice and opportunity for a hearing, have been disqualified by the Secretary to make such detection, diagnosis, or inspection. Appointment of a person in accordance with the requirements prescribed under this subsection shall not be construed as authorizing such person to conduct inspections in a manner other than that prescribed for inspections by the Secretary (or the Secretary's representative) under subsection (e).

### (d) Recordkeeping and reporting requirements; availability of records

The management of a horse show, horse exhibition, or horse sale or auction shall establish and maintain such records, make such reports, and provide such information as the Secretary may by regulation reasonably require for the purposes of implementing this chapter or to determine compliance with this chapter. Upon request of an officer or employee duly designated by the Secretary, such management shall permit entry at all reasonable times for the inspection and copying (on or off the premises) of records required to be maintained under this subsection.

### (e) Inspection by Secretary or duly appointed representative

For purposes of enforcement of this chapter (including any regulation promulgated under this chapter) the Secretary, or any representative of the Secretary duly designated by the Secretary, may inspect any horse show, horse exhibition, or horse sale or auction or any horse at any such show, exhibition, sale, or auction. Such an inspection may only be made upon presenting appropriate credentials. Each such inspection shall be commenced and completed with reasonable promptness and shall be conducted within reasonable limits and in a reasonable manner. An inspection under this subsection shall extend to all things (including records) bearing on whether the requirements of this chapter have been complied with.

(Pub. L. 91–540, §4, Dec. 9, 1970, 84 Stat. 1405; Pub. L. 94–360, §5, July 13, 1976, 90 Stat. 916.)

Editorial Notes

AMENDMENTS

1976—Pub. L. 94–360 substituted provisions relating to the inspection and disqualification of horses participating in horse shows and exhibitions, the issuance of regulations by the Secretary, and the maintenance of records by horse show management, for provisions prohibiting as constituting unlawful acts the exhibition of sored horses, the transportation in commerce for purposes of exhibition of any horse that had been sored, and the conducting of any show or exhibition in which sored horses appear. Provisions now covering such unlawful acts are set out as section 1824 of this title.

## § 1824. Unlawful acts

The following conduct is prohibited:

(1) The shipping, transporting, moving, delivering, or receiving of any horse which is sore with reason to believe that such horse while it is sore may be shown, exhibited, entered for the purpose of being shown or exhibited, sold, auctioned, or offered for sale, in any horse show, horse exhibition, or horse sale or auction; except that this paragraph does not apply to the shipping, transporting, moving, delivering, or receiving of any horse by a common or contract carrier or an employee thereof in the usual course of the carrier's business or employee's employment unless the carrier or employee has reason to believe that such horse is sore.

(2) The (A) showing or exhibiting, in any horse show or horse exhibition, of any horse which is sore, (B) entering for the purpose of showing or exhibiting in any horse show or horse exhibition, any horse which is sore, (C) selling, auctioning, or offering for sale, in any horse sale or auction, any horse which is sore, and (D) allowing any activity described in clause (A), (B), or (C) respecting a horse which is sore by the owner of such horse.

(3) The failure by the management of any horse show or horse exhibition, which does not appoint and retain a person in accordance with section 1823(c) of this title, to disqualify from being shown or exhibited any horse which is sore.

(4) The failure by the management of any horse sale or auction, which does not appoint and retain a qualified person in accordance with section 1823(c) of this title, to prohibit the sale, offering for sale, or auction of any horse which is sore.

(5) The failure by the management of any horse show or horse exhibition, which has appointed and retained a person in accordance



with section 1823(c) of this title, to disqualify from being shown or exhibited any horse (A) which is sore, and (B) after having been notified by such person or the Secretary that the horse is sore or after otherwise having knowledge that the horse is sore.

(6) The failure by the management of any horse sale or auction which has appointed and retained a person in accordance with section 1823(c) of this title, to prohibit the sale, offering for sale, or auction of any horse (A) which is sore, and (B) after having been notified by such person or the Secretary or after otherwise having knowledge that the horse is sore.

(7) The showing or exhibiting at a horse show or horse exhibition; the selling or auctioning at a horse sale or auction; the allowing to be shown, exhibited, or sold at a horse show, horse exhibition, or horse sale or auction; the entering for the purpose of showing or exhibiting in any horse show or horse exhibition; or offering for sale at a horse sale or auction, any horse which is wearing or bearing any equipment, device, paraphernalia, or substance which the Secretary by regulation under section 1828 of this title prohibits to prevent the soring of horses.

(8) The failing to establish, maintain, or submit records, notices, reports, or other information required under section 1823 of this title.

(9) The failure or refusal to permit access to or copying of records, or the failure or refusal to permit entry or inspection, as required by section 1823 of this title.

(10) The removal of any marking required by the Secretary to identify a horse as being detained.

(11) The failure or refusal to provide the Secretary with adequate space or facilities, as the Secretary may by regulation under section 1828 of this title prescribe, in which to conduct inspections or any other activity authorized to be performed by the Secretary under this chapter.

(Pub. L. 91–540, § 5, Dec. 9, 1970, 84 Stat. 1405; Pub. L. 94–360, § 6, July 13, 1976, 90 Stat. 916.)

#### Editorial Notes

##### Amendments

1976—Pub. L. 94–360 substituted provisions prohibiting the transportation, receipt, exhibition, sale, or auction of a sored horse, and the showing, sale or auction of a horse bearing any device or substance prohibited by regulation of the Secretary, and making the management of a horse show, exhibition, or sale, responsible for failure to disqualify such horses from participating, and for interfering with the conducting of inspections by the Secretary of horses in the show or of the management records, for provisions authorizing the inspection of horses, transported in commerce, and requiring the management of shows and exhibitions to maintain such records as the Secretary prescribes. Provisions now covering the maintenance of records and the inspection of horses are set out as section 1823 of this title.

### § 1824a. Export of horses

#### (a) Restriction on export of horses

Notwithstanding any other provision of law, no horse may be exported by sea from the United States, or any of its territories or possessions, unless such horse is part of a consignment of horses with respect to which a waiver has been granted under subsection (b).

#### (b) Granting of waivers

The Secretary of Commerce, in consultation with the Secretary of Agriculture, may issue regulations providing for the granting of waivers permitting the export by sea of a specified consignment of horses, if the Secretary of Commerce, in consultation with the Secretary of Agriculture, determines that no horse in that consignment is being exported for purposes of slaughter.

#### (c) Penalties

##### (1) Criminal penalty

Any person who knowingly violates this section or any regulation, order, or license issued under this section shall be fined not more than 5 times the value of the consignment of horses involved or $50,000, whichever is greater, or imprisoned not more than 5 years, or both.

##### (2) Civil penalty

The Secretary of Commerce, after providing notice and an opportunity for an agency hearing on the record, may impose a civil penalty of not to exceed $10,000 for each violation of this section or any regulation, order, or license issued under this section, either in addition to or in lieu of any other liability or penalty which may be imposed.

(Mar. 3, 1891, ch. 521, § 3, as added Pub. L. 99–64, title I, § 125, July 12, 1985, 99 Stat. 156.)

#### Editorial Notes

##### Codification

Section was not enacted as part of the Horse Protection Act of 1970 which comprises this chapter.

Section was classified to section 466c of the former Appendix to Title 46, prior to the completion of the enactment of Title 46, Shipping, by Pub. L. 109–304, Oct. 6, 2006, 120 Stat. 1485.

##### Prior Provisions

Provisions similar to those in this section were contained in section 7(j) of Pub. L. 96–72, formerly classified to section 4606(j) of Title 50, War and National Defense, prior to the amendment of section 7(j) of that Act by Pub. L. 99–64, which enacted this section.

### § 1825. Violations and penalties

#### (a) Criminal acts and penalties

(1) Except as provided in paragraph (2) of this subsection, any person who knowingly violates section 1824 of this title shall, upon conviction thereof, be fined not more than $3,000, or imprisoned for not more than one year, or both.

(2)(A) If any person knowingly violates section 1824 of this title, after one or more prior convictions of such person for such a violation have become final, such person shall, upon conviction thereof, be fined not more than $5,000, or imprisoned for not more than two years, or both.

(B) Any person who knowingly makes, or causes to be made, a false entry or statement in any report required under this chapter; who knowingly makes, or causes to be made, any false entry in any account, record, or memo-

randum required to be established and maintained by any person or in any notification or other information required to be submitted to the Secretary under section 1823 of this title; who knowingly neglects or fails to make or cause to be made, full, true, and correct entries in such accounts, records, memoranda, notification, or other materials; who knowingly removes any such documentary evidence out of the jurisdiction of the United States; who knowingly mutilates, alters, or by any other means falsifies any such documentary evidence; or who knowingly refuses to submit any such documentary evidence to the Secretary for inspection and copying shall be guilty of an offense against the United States, and upon conviction thereof shall be fined not more than $5,000, or imprisoned for not more than three years, or both.

(C) Any person who forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person while engaged in or on account of the performance of his official duties under this chapter shall be fined not more than $5,000, or imprisoned not more than three years, or both. Whoever, in the commission of such acts, uses a deadly or dangerous weapon shall be fined not more than $10,000, or imprisoned not more than ten years, or both. Whoever kills any person while engaged in or on account of the performance of his official duties under this chapter shall be punishable as provided under sections 1111 and 1112 of title 18.

**(b) Civil penalties; review and enforcement**

(1) Any person who violates section 1824 of this title shall be liable to the United States for a civil penalty of not more than $2,000 for each violation. No penalty shall be assessed unless such person is given notice and opportunity for a hearing before the Secretary with respect to such violation. The amount of such civil penalty shall be assessed by the Secretary by written order. In determining the amount of such penalty, the Secretary shall take into account all factors relevant to such determination, including the nature, circumstances, extent, and gravity of the prohibited conduct and, with respect to the person found to have engaged in such conduct, the degree of culpability, any history of prior offenses, ability to pay, effect on ability to continue to do business, and such other matters as justice may require.

(2) Any person against whom a violation is found and a civil penalty assessed under paragraph (1) of this subsection may obtain review in the court of appeals of the United States for the circuit in which such person resides or has his place of business or in the United States Court of Appeals for the District of Columbia Circuit by filing a notice of appeal in such court within 30 days from the date of such order and by simultaneously sending a copy of such notice by certified mail to the Secretary. The Secretary shall promptly file in such court a certified copy of the record upon which such violation was found and such penalty assessed, as provided in section 2112 of title 28. The findings of the Secretary shall be set aside if found to be unsupported by substantial evidence.

(3) If any person fails to pay an assessment of a civil penalty after it has become a final and unappealable order, or after the appropriate court of appeals has entered final judgment in favor of the Secretary, the Secretary shall refer the matter to the Attorney General, who shall recover the amount assessed in any appropriate district court of the United States. In such action, the validity and appropriateness of the final order imposing the civil penalty shall not be subject to review.

(4) The Secretary may, in his discretion, compromise, modify, or remit, with or without conditions, any civil penalty assessed under this subsection.

**(c) Disqualification of offenders; orders; civil penalties applicable; enforcement procedures**

In addition to any fine, imprisonment, or civil penalty authorized under this section, any person who was convicted under subsection (a) or who paid a civil penalty assessed under subsection (b) or is subject to a final order under such subsection assessing a civil penalty for any violation of any provision of this chapter or any regulation issued under this chapter may be disqualified by order of the Secretary, after notice and an opportunity for a hearing before the Secretary, from showing or exhibiting any horse, judging or managing any horse show, horse exhibition, or horse sale or auction for a period of not less than one year for the first violation and not less than five years for any subsequent violation. Any person who knowingly fails to obey an order of disqualification shall be subject to a civil penalty of not more than $3,000 for each violation. Any horse show, horse exhibition, or horse sale or auction, or the management thereof, collectively and severally, which knowingly allows any person who is under an order of disqualification to show or exhibit any horse, to enter for the purpose of showing or exhibiting any horse, to take part in managing or judging, or otherwise to participate in any horse show, horse exhibition, or horse sale or auction in violation of an order shall be subject to a civil penalty of not more than $3,000 for each violation. The provisions of subsection (b) of this section respecting the assessment, review, collection, and compromise, modification, and remission of a civil penalty apply with respect to civil penalties under this subsection.

**(d) Production of witnesses and books, papers, and documents; depositions; fees; presumptions; jurisdiction**

(1) The Secretary may require by subpena the attendance and testimony of witnesses and the production of books, papers, and documents relating to any matter under investigation or the subject of a proceeding. Witnesses summoned before the Secretary shall be paid the same fees and mileage that are paid witnesses in the courts of the United States.

(2) The attendance of witnesses, and the production of books, papers, and documents, may be required at any designated place from any place in the United States. In case of disobedience to a subpena the Secretary, or any party to a proceeding before the Secretary, may invoke the aid of any appropriate district court of the United States in requiring attendance and testimony of witnesses and the production of such books, papers, and documents under the provisions of this chapter.

(3) The Secretary may order testimony to be taken by deposition under oath in any proceeding or investigation pending before him, at any stage of the proceeding or investigation. Depositions may be taken before any person designated by the Secretary who has power to administer oaths. The Secretary may also require the production of books, papers, and documents at the taking of depositions.

(4) Witnesses whose depositions are taken and the persons taking them shall be entitled to the same fees as paid for like services in the courts of the United States or in other jurisdictions in which they may appear.

(5) In any civil or criminal action to enforce this chapter or any regulation under this chapter a horse shall be presumed to be a horse which is sore if it manifests abnormal sensitivity or inflammation in both of its forelimbs or both of its hindlimbs.

(6) The United States district courts, the District Court of Guam, the District Court of the Virgin Islands, the highest Court of American Samoa, and the United States courts of the other territories, are vested with jurisdiction specifically to enforce, and to prevent and restrain violations of this chapter, and shall have jurisdiction in all other kinds of cases arising under this chapter, except as provided in subsection (b) of this section.

**(e) Detention of horses; seizure and condemnation of equipment**

(1) The Secretary may detain (for a period not to exceed twenty-four hours) for examination, testing, or the taking of evidence, any horse at any horse show, horse exhibition, or horse sale or auction which is sore or which the Secretary has probable cause to believe is sore. The Secretary may require the temporary marking of any horse during the period of its detention for the purpose of identifying the horse as detained. A horse which is detained subject to this paragraph shall not be moved by any person from the place it is so detained except as authorized by the Secretary or until the expiration of the detention period applicable to the horse.

(2) Any equipment, device, paraphernalia, or substance which was used in violation of any provision of this chapter or any regulation issued under this chapter or which contributed to the soring of any horse at or prior to any horse show, horse exhibition, or horse sale or auction, shall be liable to be proceeded against, by process of libel for the seizure and condemnation of such equipment, device, paraphernalia, or substance, in any United States district court within the jurisdiction of which such equipment, device, paraphernalia, or substance is found. Such proceedings shall conform as nearly as possible to proceedings in rem in admiralty.

(Pub. L. 91–540, §6, Dec. 9, 1970, 84 Stat. 1406; Pub. L. 94–360, §7, July 13, 1976, 90 Stat. 918.)

EDITORIAL NOTES

AMENDMENTS

1976—Subsec. (a). Pub. L. 94–360 substituted provisions increasing the maximum amount of fine that can be imposed and the maximum length of imprisonment that can be ordered for knowingly performing enumer-

ated activities prohibited under this chapter, for provisions authorizing a maximum civil penalty of $1,000 for each unintentional violation of this chapter, requiring notice to an alleged violator prior to assessment of any penalty and authorizing the institution of civil actions by the Attorney General to enforce such penalties.

Subsec. (b). Pub. L. 94–360 substituted provisions relating to imposition of civil penalties up to $2,000, criteria for imposition of particular amounts, and procedures for review and enforcement of civil penalties, for provisions authorizing fines up to $2,000 and/or imprisonment up to six months for intentional violations of provisions of this chapter or any regulation issued thereunder.

Subsecs. (c) to (e). Pub. L. 94–360 added subsecs. (c) to (e).

## § 1826. Notice of violations to Attorney General

Whenever the Secretary believes that a willful violation of this chapter has occurred and that prosecution is needed to obtain compliance with this chapter, he shall inform the Attorney General and the Attorney General shall take such action with respect to such matter as he deems appropriate.

(Pub. L. 91–540, §7, Dec. 9, 1970, 84 Stat. 1406.)

## § 1827. Utilization of personnel of Department of Agriculture and officers and employees of consenting States; technical and other nonfinancial assistance to State

**(a) Assistance from Department of Agriculture and States**

The Secretary, in carrying out the provisions of this chapter, shall utilize, to the maximum extent practicable, the existing personnel and facilities of the Department of Agriculture. The Secretary is further authorized to utilize the officers and employees of any State, with its consent, and with or without reimbursement, to assist him in carrying out the provisions of this chapter.

**(b) Assistance to States**

The Secretary may, upon request, provide technical and other nonfinancial assistance (including the lending of equipment on such terms and conditions as the Secretary determines is appropriate) to any State to assist it in administering and enforcing any law of such State designed to prohibit conduct described in section 1824 of this title.

(Pub. L. 91–540, §8, Dec. 9, 1970, 84 Stat. 1406; Pub. L. 94–360, §8, July 13, 1976, 90 Stat. 920.)

EDITORIAL NOTES

AMENDMENTS

1976—Pub. L. 94–360 designated existing provisions as subsec. (a) and added subsec. (b).

## § 1828. Rules and regulations

The Secretary is authorized to issue such rules and regulations as he deems necessary to carry out the provisions of this chapter.

(Pub. L. 91–540, §9, Dec. 9, 1970, 84 Stat. 1406.)

## § 1829. Preemption of State laws; concurrent jurisdiction; prohibition on certain State action

No provision of this chapter shall be construed as indicating an intent on the part of the Con-



to any hearing to be conducted by telephone or audio-visual telecommunication;

(10) Require each party to provide all other parties with a copy of any document that the party intends to use to examine a deponent prior to any deposition to be conducted by telephone or audio-visual telecommunication;

(11) Require that any hearing to be conducted by telephone or audio-visual telecommunication be conducted at locations at which the parties and the Judge are able to transmit and receive documents during the hearing;

(12) Require that any deposition to be conducted by telephone or audio-visual telecommunication be conducted at locations at which the parties are able to transmit and receive documents during the deposition;

(13) Do all acts and take all measures necessary for the maintenance of order, including the exclusion of contumacious counsel or other persons; and

(14) Take all other actions authorized under these rules.

(d) *Who may act in the absence of the Judge.* In case of the absence of the Judge or the Judge's inability to act, the powers and duties to be performed by the Judge under these rules of practice in connection with any assigned proceeding may, without abatement of the proceeding unless otherwise directed by the Chief Judge, be assigned to any other Judge.

[42 FR 743, Jan. 4, 1977, as amended at 60 FR 8456, Feb. 14, 1995; 68 FR 6340, Feb. 7, 2003]

### § 1.145 Appeal to Judicial Officer.

(a) *Filing of petition.* Within 30 days after receiving service of the Judge's decision, if the decision is a written decision, or within 30 days after issuance of the Judge's decision, if the decision is an oral decision, a party who disagrees with the decision, any part of the decision, or any ruling by the Judge or who alleges any deprivation of rights, may appeal the decision to the Judicial Officer by filing an appeal petition with the Hearing Clerk. As provided in § 1.141(h)(2), objections regarding evidence or a limitation regarding examination or cross-examination or other ruling made before the Judge may be relied upon in an appeal. Each issue set forth in the appeal peti-

tion and the arguments regarding each issue shall be separately numbered; shall be plainly and concisely stated; and shall contain detailed citations to the record, statutes, regulations, or authorities being relied upon in support of each argument. A brief may be filed in support of the appeal simultaneously with the appeal petition.

(b) *Response to appeal petition.* Within 20 days after the service of a copy of an appeal petition and any brief in support thereof, filed by a party to the proceeding, any other party may file with the Hearing Clerk a response in support of or in opposition to the appeal and in such response any relevant issue, not presented in the appeal petition, may be raised.

(c) *Transmittal of record.* Whenever an appeal of a Judge's decision is filed and a response thereto has been filed or time for filing a response has expired, the Hearing Clerk shall transmit to the Judicial Officer the record of the proceeding. Such record shall include: the pleadings; motions and requests filed and rulings thereon; the transcript or recording of the testimony taken at the hearing, together with the exhibits filed in connection therewith; any documents or papers filed in connection with a prehearing conference; such proposed findings of fact, conclusions, and orders, and briefs in support thereof, as may have been filed in connection with the proceeding; the Judge's decision; such exceptions, statements of objections and briefs in support thereof as may have been filed in the proceeding; and the appeal petition, and such briefs in support thereof and responses thereto as may have been filed in the proceeding.

(d) *Oral argument.* A party bringing an appeal may request, within the prescribed time for filing such appeal, an opportunity for oral argument before the Judicial Officer. Within the time allowed for filing a response, appellee may file a request in writing for opportunity for such an oral argument. Failure to make such request in writing, within the prescribed time period, shall be deemed a waiver of oral argument. The Judicial Officer may grant, refuse, or limit any request for oral argument. Oral argument shall not be transcribed

unless so ordered in advance by the Judicial Officer for good cause shown upon request of a party or upon the Judicial Officer's own motion.

(e) *Scope of argument.* Argument to be heard on appeal, whether oral or on brief, shall be limited to the issues raised in the appeal or in the response to the appeal, except that if the Judicial Officer determines that additional issues should be argued, the parties shall be given reasonable notice of such determination, so as to permit preparation of adequate arguments on all issues to be argued.

(f) *Notice of argument; postponement.* The Hearing Clerk shall advise all parties of the time and place at which oral argument will be heard. A request for postponement of the argument must be made by motion filed a reasonable amount of time in advance of the date fixed for argument.

(g) *Order of argument.* The appellant is entitled to open and conclude the argument.

(h) *Submission on briefs.* By agreement of the parties, an appeal may be submitted for decision on the briefs, but the Judicial Officer may direct that the appeal be argued orally.

(i) *Decision of the judicial officer on appeal.* As soon as practicable after the receipt of the record from the Hearing Clerk, or, in case oral argument was had, as soon as practicable thereafter, the Judicial Officer, upon the basis of and after due consideration of the record and any matter of which official notice is taken, shall rule on the appeal. If the Judicial Officer decides that no change or modification of the Judge's decision is warranted, the Judicial Officer may adopt the Judge's decision as the final order in the proceeding, preserving any right of the party bringing the appeal to seek judicial review of such decision in the proper forum. A final order issued by the Judicial Officer shall be filed with the Hearing Clerk. Such order may be regarded by the respondent as final for purposes of judicial review without filing a petition for rehearing, reargument, or reconsideration of the decision of the Judicial Officer.

[42 FR 743, Jan. 4, 1977, as amended at 60 FR 8456, Feb. 14, 1995; 68 FR 6341, Feb. 7, 2003]

**§ 1.146 Petitions for reopening hearing; for rehearing or reargument of proceeding; or for reconsideration of the decision of the Judicial Officer.**

(a) *Petition requisite*—(1) *Filing; service; ruling.* A petition for reopening the hearing to take further evidence, or for rehearing or reargument of the proceeding, or for reconsideration of the decision of the Judicial Officer, must be made by petition filed with the Hearing Clerk. Every such petition must state specifically the grounds relied upon. Any such petition filed prior to the filing of an appeal of the Judge's decision pursuant to § 1.145 shall be ruled upon by the Judge, and any such petition filed thereafter shall be ruled upon by the Judicial Officer.

(2) *Petition to reopen hearing.* A petition to reopen a hearing to take further evidence may be filed at any time prior to the issuance of the decision of the Judicial Officer. Every such petition shall state briefly the nature and purpose of the evidence to be adduced, shall show that such evidence is not merely cumulative, and shall set forth a good reason why such evidence was not adduced at the hearing.

(3) *Petition to rehear or reargue proceeding, or to reconsider the decision of* the Judicial Officer. A petition to rehear or reargue the proceeding or to reconsider the decision of the Judicial Officer shall be filed within 10 days after the date of service of such decision upon the party filing the petition. Every petition must state specifically the matters claimed to have been erroneously decided and alleged errors must be briefly stated.

(b) *Procedure for disposition of petitions.* Within 20 days following the service of any petition provided for in this section, any party to the proceeding may file with the Hearing Clerk a reply thereto. As soon as practicable thereafter, the Judge or the Judicial Officer, as the case may be, shall announce the determination whether to grant or deny the petition. The decision of the Judicial Officer shall automatically be stayed pending the determination to grant or deny a timely petition. Such decision shall not be final for purposes of judicial review until the petition is denied or the decision is affirmed or



(14) Administer the Controlled Unclassified Information (CUI) Program for the Department pursuant to E.O. 13556, "Controlled Unclassified Information" (75 FR 68675, 3 CFR, 2011 Comp., p. 267) and 32 CFR part 2002.

(b) [Reserved]

[85 FR 65512, Oct. 15, 2020, as amended at 88 FR 70580, Oct. 12, 2023]

### § 2.33 Inspector General.

(a) The following delegations of authority are made by the Secretary of Agriculture to the Inspector General:

(1) Advise the Secretary and General officers in the planning, development, and execution of Department policies and programs.

(2) At the request of the Director, Homeland Security Staff (Director), determine the availability of law enforcement personnel of the Office of Inspector General to assist the Director in providing for the personal security for the Secretary and the Deputy Secretary.

(3) Serve as liaison official for the Department for all audits of USDA performed by the General Accounting Office.

(4) In addition to the above delegations of authority, the Inspector General, under the general supervision of the Secretary, has specific duties, responsibilities, and authorities pursuant to the Inspector General Act of 1978, Pub. L. No. 95–452, 5 U.S.C. App.

(b) The following authority is reserved to the Secretary of Agriculture: Approving the implementation in the Office of Inspector General of administrative policies or procedures that contravene standard USDA administrative policies as promulgated by the Assistant Secretary for Administration.

[60 FR 56393, Nov. 8, 1995, as amended at 72 FR 36859, July 6, 2007]

### § 2.34 Director, National Appeals Division.

The Director, National Appeals Division, under the general supervision of the Secretary or Deputy Secretary, has specific duties, responsibilities, and authorities pursuant to subtitle H of the Department of Agriculture Reorganization Act of 1994, Public Law 103–354 (7 U.S.C. 6991 *et seq.*), including:

(a) Deciding appeals from adverse decisions, made by an officer or employee of an agency of the Department designated by the Secretary, that are adverse to participants. The term "agency" shall include the following and any predecessor agency: the Farm Service Agency; the Commodity Credit Corporation (with respect to domestic programs); the Federal Crop Insurance Corporation; the Rural Housing Service; the Rural Business-Cooperative Service; the Natural Resources Conservation Service; and a State, county, or area committee established under section 8(b)(5) of the Soil Conservation and Domestic Allotment Act (16 U.S.C. 590h(b)(5)); and

(b) The authority to appoint such hearing officers and other employees as are necessary for the administration of the activities of the Division.

(c) Prepare a report each year on the number of requests for equitable relief and the disposition of such requests for inclusion in the report of the Secretary to Congress on equitable relief requests made to the Department under farm and conservation programs (7 U.S.C. 7996(g)(2).

[60 FR 56393, Nov. 8, 1995, as amended at 68 FR 27442, May 20, 2003; 79 FR 44112, July 30, 2014]

### § 2.35 Judicial Officer.

(a) Pursuant to the Act of April 4, 1940, as amended (7 U.S.C. 450c–450g), and Reorganization Plan No. 2 of 1953 (5 U.S.C. app.), the Secretary of Agriculture makes the following delegations of authority to the Judicial Officer. The Judicial Officer is authorized to:

(1) Act as final deciding officer in adjudicatory proceedings subject to 5 U.S.C. 556 and 557;

(2) Act as final deciding officer in adjudicatory proceedings which are or may be subject to the "Rules of Practice Governing Formal Adjudicatory Proceedings Instituted by the Secretary Under Various Statutes" set forth in part 1, subpart H, of this title;

(3) Act as final deciding officer in adjudicatory proceedings which are or may be subject to the "Rules of Practice Governing Cease and Desist Proceedings Under Section 2 of the Capper-

Volstead Act'' set forth in part 1, subpart I, of this title;

(4) Act as final deciding officer in adjudicatory proceedings subject to the ''Procedures Related to Administrative Hearings Under the Program Fraud Civil Remedies Act of 1986'' set forth in part 1, subpart L, of this title;

(5) Act as final deciding officer in adjudicatory proceedings subject to the ''Rules of Practice Governing Adjudication of Sourcing Area Applications and Formal Review of Sourcing Areas Pursuant to the Forest Resources Conservation and Shortage Relief Act of 1990 (16 U.S.C. 620, *et seq.*)'' set forth in part 1, subpart M, of this title;

(6) Act as final deciding officer in rate proceedings under the Packers and Stockyards Act, as amended and supplemented (7 U.S.C. 181–229);

(7) Act as final deciding officer in reparation proceedings under statutes administered by the United States Department of Agriculture;

(8) Act as final deciding officer in appeals under section 63 of the Plant Variety Protection Act (7 U.S.C. 2443), and in reexamination proceedings under section 91 of the Plant Variety Protection Act, as amended (7 U.S.C. 2501);

(9) Act as final deciding officer in adjudicatory proceedings under section 359i of the Agricultural Adjustment Act of 1938, as amended (7 U.S.C. 1359ii);

(10) Issue rules of practice applicable to proceedings conducted under section 359i of the Agricultural Adjustment Act of 1938, as amended (7 U.S.C. 1359ii);

(11) Act as final deciding officer in adjudicatory proceedings subject to the ''Rules of Practice Governing Proceedings on Petitions To Modify or To Be Exempted From Marketing Orders'' set forth in sections 900.50 through 900.71 of this title;

(12) Act as final deciding officer in adjudicatory proceedings subject to the ''Rules of Practice Governing Proceedings on Petitions to Modify or To Be Exempted from Research, Promotion, and Information Programs'' set forth in part 1200, subpart B, of this title; and

(13) Act as final deciding officer in adjudicatory proceedings subject to

''Appeals of Quality Control ('QC') Claims'' set forth in part 283 of this title.

(b) The delegation of authority from the Secretary of Agriculture to the Judicial Officer in paragraph (a) of this section shall not be construed to limit the authority of the Judicial Officer to perform any functions, in addition to those identified in the Act of April 4, 1940, as amended (7 U.S.C. 450c–450g), which may be assigned by the Secretary of Agriculture to the Judicial Officer.

(c) As used in this section, the term *Judicial Officer* shall mean any person or persons so designated by the Secretary of Agriculture.

[68 FR 27443, May 20, 2003, as amended at 75 FR 43380, July 23, 2010]

## § 2.36 Director, Office of Communications.

(a) *Delegations.* The following delegations of authority are made by the Secretary of Agriculture to Director, Office of Communications:

(1) *Related to public affairs.* (i) Advise and counsel general officers on public affairs matters to the Department.

(ii) Organize and direct the activities of a public affairs office to include press relations of the secretary of agriculture and other executive functions and services for general officers of the Department.

(2) *Related to information activities.* (i) Advise the secretary and general officers in the planning, development, and execution of Department policies and programs.

(ii) Direct and coordinate the overall formulation and development of policies, programs, plans, procedures, standards and organization structures and staffing patterns for the information activities of the Department and its agencies, both in Washington and in the field.

(iii) Exercise final review and approval of all public information material prepared by the Department and its agencies and select the most effective method and audience for distributing this information.

(iv) Serve as the central public information authority in the USDA, with authority to determine policy for all

244