

August 1, 2025

**VIA CM/ECF**

Ms. Nwamaka Anowi
United States Court of Appeals
Fourth Circuit
Office of the Clerk
1100 East Main Street, Suite 501
Richmond, VA 23219

Re:     Notice of Supplemental Authority: *Manis v. USDA,* No. 24-1367

Dear Ms. Anowi:

Appellant Joe Manis submits this Rule 28(j) letter to advise the Court of the attached decision in *Sun Valley Orchards, LLC v. U.S. Dep't of Lab.*, --- F.4th ---, 2025 WL 2112927 (3d Cir. July 29, 2025). This is the second circuit court decision applying *SEC v. Jarkesy*, 603 U.S. 109 (2024) to hold that common law-analogous claims with civil money penalties must be adjudicated in an Article III court. *See* Doc. 58.

*Sun Valley* considered whether alleged violations of job orders between employers and H2-A visa workers must be adjudicated in an Article III court. 2025 WL 2112927, at *2–4. The court concluded that they did. *Id.* at *7. Such claims were effectively common law breach of contract suits with punitive monetary remedies. *Id.* at *4–5. They also did not fall within the limited public rights exception for immigration adjudications because the job orders concerned the regulation of "domestic wages," not border control. *Id.* at *6–7.

*Sun Valley* supports in two ways Manis's argument that the Horse Protection Act (HPA) claim against him must be adjudicated in an Article III court. First, *Sun Valley* confirms that *Jarkesy* applies to both Seventh Amendment and Article III claims. *Sun Valley*, 2025 WL 2112927, at *4–5 & n.3. Thus, regardless of whether the HPA claim meets the Seventh Amendment dollar threshold, its common law nature still requires Article III adjudication. Doc. 18 at 44.

Notice of Supplemental Authority
*Manis v. USDA*, No. 24-1367
August 1, 2025
Page 2


Second, *Sun Valley* reflects the narrowness of the public rights exception to Article III adjudication, requiring "'a serious and unbroken' history of non-Article-III resolution." *Id.* at *4. USDA has not offered a historical basis for the non-Article III adjudication of the HPA claim at issue here. Doc. 21 at 28–31. Thus, given the HPA claim is a common law action in debt for civil money penalties that is also analogous to common law fraud, it does not fall within the public rights exception. Doc. 18 at 38–44; Doc. 25-1.

Respectfully submitted,

/s/ *Joshua M. Robbins*
Joshua M. Robbins
PACIFIC LEGAL FOUNDATION
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
(202) 945-9524
JRobbins@pacificlegal.org

*Counsel for Appellant*

cc: All Counsel of Record

Notice of Supplemental Authority
*Manis v. USDA*, No. 24-1367
August 1, 2025
Page 3

**CERTIFICATE OF COMPLIANCE AND SERVICE**

I hereby certify that the body of this letter is 328 words. I relied on my word processor, Microsoft Word, to obtain the count.

I hereby certify that on August 1, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Joshua M. Robbins
Joshua M. Robbins

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-2608
_____

SUN VALLEY ORCHARDS, LLC,
*Appellant*

v.

U.S. DEPARTMENT OF LABOR; UNITED STATES
SECRETARY OF LABOR
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 1:21-cv-16625)
District Judge: Hon. Joseph H. Rodriguez
_____

Argued on April 10, 2025

Before: HARDIMAN, PORTER, and SMITH, *Circuit
Judges*.

(Filed: July 29, 2025)

Robert M. Belden
Institute for Justice

901 N. Glebe Road
Suite 900
Arlington, VA 22203

Robert E. Johnson [Argued]
Institute for Justice
16781 Chagrin Boulevard
Suite 256
Shaker Heights, OH 44120

            *Counsel for Appellant*

Daniel J. Aguilar [Argued]
U.S. Department of Justice
Civil Division
950 Pennsylvania Avenue NW
Room 7266
Washington, D.C. 20530

            *Counsel for Appellees*

Adina H. Rosenbaum
Nicolas A. Sansone
Allison M. Zieve
Public Citizen Litigation Group
1600 20th Street NW
Washington, D.C. 20009

            *Counsel for Amicus Curiae Public Citizen in
            Support of Appellees*

---

OPINION OF THE COURT

---

HARDIMAN, *Circuit Judge*.

The United States Department of Labor (DOL) alleged that Sun Valley Orchards, a New Jersey farm, breached an employment agreement formed under the H-2A nonimmigrant visa program. Instead of pursuing its case in a federal district court, DOL imposed hundreds of thousands of dollars in civil penalties and back wages through in-house administrative proceedings. Sun Valley challenged this order under the Administrative Procedure Act, but the District Court dismissed its claims. Following the Supreme Court's recent decision in *SEC v. Jarkesy*, 603 U.S. 109 (2024), we hold that Sun Valley was entitled to have its case decided by an Article III court. We will reverse.

I

A

Under the H-2A nonimmigrant visa program, domestic employers may temporarily hire foreign laborers to perform seasonal agricultural work. *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(a). Because the program exists at the intersection of labor and immigration law, it is administered jointly by DOL and the Department of Homeland Security (DHS). Prospective H-2A employers must obtain two forms of authorization: a labor certification from DOL and a visa petition approval from DHS. *See id.* § 1188(a).

This case arises from regulations under the labor certification process. The Immigration and Nationality Act (INA) requires prospective H-2A employers to demonstrate that:

> (A) there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, and

> (B) the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed.

*Id.* § 1188(a)(1).

To satisfy that statutory requirement, employers must first attempt to recruit U.S. workers. *See id.* § 1188(b)(4); 20 C.F.R. § 655.121(f). To that end, employers must offer U.S. workers "no less than the same benefits, wages, and working conditions" that the employer offers H-2A workers. 20 C.F.R. § 655.122(a). Regulations dictate what benefits H-2A workers—and therefore, corresponding U.S. workers—must receive. *See generally id.* § 655.122. Relevant here, employers must provide no-cost housing, *see id.* § 655.122(d)(1), access to a kitchen or meal plan, *see id.* § 655.122(g), and transportation to the work site, *see id.* § 655.122(h). These conditions are incorporated into a "job order," which is posted domestically before it is circulated to foreign workers. *Id.* § 655.121(f).

The job order functions as a work contract absent a written agreement, and DOL may enforce its terms. *See id.*

§ 655.122(q). Federal law authorizes the Secretary of Labor "to take such actions, including imposing appropriate penalties and seeking appropriate injunctive relief and specific performance of contractual obligations, as may be necessary to assure employer compliance with terms and conditions of employment under" the H-2A program. 8 U.S.C. § 1188(g)(2). Relying on that language, DOL has promulgated regulations authorizing its Wage and Hour Division to impose civil penalties and back wages on participating employers.[1] *See* 29 C.F.R. § 501.16; 20 C.F.R. § 655.101(b).

An employer targeted for enforcement may request a hearing before an Administrative Law Judge (ALJ). *See* 29 C.F.R. § 501.33. ALJs are removeable by the Secretary of Labor for cause, *see* 5 U.S.C. § 7521(a), and the Federal Rules of Evidence do not apply to their proceedings, *see* 29 C.F.R. § 501.34. ALJ decisions become final unless review is taken by the Administrative Review Board. *See id.* § 501.42.

## B

Sun Valley is a farm in New Jersey. The farm grows fruits and vegetables, including asparagus, zucchini,

---

[1] DOL may enforce contractual obligations on behalf of both H-2A workers and workers in "corresponding employment," which can include U.S. workers. 29 C.F.R. § 501.0; *see also* 20 C.F.R. § 655.103(b) (defining "corresponding employment"). This "ensure[s] that foreign workers will not appear more attractive to the 'employer' than domestic workers, thus avoiding any adverse effects for domestic workers." *Garcia-Celestino v. Ruiz Harvesting, Inc.*, 843 F.3d 1276, 1285 (11th Cir. 2016).

cucumber, eggplant, peppers, and peaches. Sun Valley relies on seasonal workers hired through the H-2A program.

Sun Valley first participated in the program in 2015, hiring 96 foreign workers and 51 corresponding domestic workers. Through a job order, Sun Valley promised at least forty hours of work per week for twenty-six weeks of employment. Consistent with applicable regulations, Sun Valley guaranteed employment for "the hourly equivalent of 3/4" of the hours contemplated by the agreement. App. 203. It offered no-cost housing and free transportation to the worksite. And it promised to "furnish free cooking and kitchen facilities to those workers who are entitled to live in the employers' housing so that workers may prepare their own meals" and to provide "free transportation" to the closest grocery store. App. 193.

According to DOL, Sun Valley did not keep those promises. After spending time at the farm in 2015, agency investigators identified several job order violations. DOL confirmed those violations in a letter to Sun Valley, assessing hundreds of thousands of dollars in civil penalties and back wages.

DOL first identified violations concerning housing. Sun Valley's job order had promised its employees no-cost housing satisfying "the full set of DOL Occupational Safety and Health Administration (OSHA) standards." App. 193; *see also* 20 C.F.R. § 655.122(d)(1). But the investigation found that "the housing facility provided for workers was missing window screens and had screen doors not in good repair," which contributed to an "insect infestation throughout the camp." App. 154. The investigation also revealed that "[s]everal bathroom sinks did not have hot water, refuse containers

throughout [the] facility were missing fly tight lids and
multiple mattresses used by occupants for sleeping purposes
were directly on the floor without a bed frame." *Id.* DOL
assessed $3,600 in civil penalties for these alleged violations.

DOL also found violations related to Sun Valley's meal
plan. Sun Valley's job order had not mentioned a meal plan,
instead promising to "furnish free cooking and kitchen
facilities . . . so that workers may prepare their own meals" and
to provide "free transportation" to nearby grocery stores. App.
193. The investigation revealed, however, that Sun Valley had
failed to provide meaningful kitchen access in violation of the
job order, instead deciding to charge workers for meals without
notice. The investigator also found that a supervisor regularly
charged workers for drinks. Because Sun Valley did not
provide kitchen access, failed to give notice of its alternative
meal plan, and sold drinks at a profit, DOL assessed $198,450
in penalties and $234,079.28 in back wages.

DOL identified a violation related to transportation, as
well. H-2A employers must provide workers with
transportation to the job site that "compl[ies] with all
applicable local, State, or Federal laws and regulations,"
including those governing "transportation safety standards,
driver's licensure, and vehicle insurance." 20 C.F.R.
§ 655.122(h)(4)(i). Consistent with that requirement, Sun
Valley promised its employees "free transportation" from the
"housing facility both to and from the daily work site." App.
205. But DOL's investigation revealed that "three of the five
vehicles used to transport workers had insufficient tread on the
tires for safe operation and one had a non-functioning rear
directional." App. 154–55. The investigation also revealed that
"the five vehicles used to transport H-2A and corresponding
[domestic] workers were operated by drivers who failed to

possess valid, unexpired driver's licenses." App. 155. DOL assessed $7,500 in civil penalties for this violation.

Finally, DOL claimed that Sun Valley violated the "three-fourths guarantee." *Id.* Consistent with regulations, Sun Valley had guaranteed employment for "the hourly equivalent of 3/4" of the workdays contemplated by the job order. App. 203; *see also* 20 C.F.R. § 655.122(i). But DOL's investigation revealed that, following a dispute between workers and management, Sun Valley "constructively forced [some employees] to return home prior to the end of the contract period," coercing them to "sign a form . . . stating that they were leaving early for 'personal reasons.'" App. 155–56. This action, DOL alleged, violated both Sun Valley's job order and a regulation prohibiting employers from "seek[ing] to have an H-2A worker . . . waive any rights conferred under" laws and regulations governing the program. 29 C.F.R. § 501.5. DOL assessed $2,700 in penalties and $135,623.94 in back wages for these violations.

All told, Sun Valley was assessed $212,250 in civil penalties and $369,703.22 in back wages, payable directly to DOL. DOL notified Sun Valley of its "right to request a hearing" before an ALJ to contest the assessment. App. 150; *see also* 29 C.F.R. § 501.33. But if the farm failed to request a hearing within thirty days, DOL's findings would become "the final and unappealable Order of the Secretary." App. 150.

C

Sun Valley timely requested a hearing before an ALJ. The ALJ affirmed in part and modified in part DOL's findings. In a lengthy written opinion, the ALJ agreed with DOL that Sun Valley violated a host of job order provisions. The ALJ

parted with DOL's view only as to the amount of civil penalties and back wages owed, modifying those figures to $211,800 and $344,945.80, respectively. Sun Valley petitioned the Administrative Review Board for review, which affirmed the ALJ's decision in its entirety.

Sun Valley challenged DOL's decision in the District Court, seeking declaratory and injunctive relief under the Administrative Procedure Act. It alleged several statutory and constitutional defects in DOL's order, including that: (1) it adjudicated private rights in violation of Article III of the Constitution, (2) the ALJ presiding over the case was appointed and insulated from removal in violation of Article II of the Constitution, (3) the penalties and back wages assessed by the order were excessive in violation of the Eighth Amendment, and (4) DOL lacked statutory authority to impose civil penalties and back wages through administrative proceedings.[2] DOL moved to dismiss, and both parties cross-moved for summary judgment.

The District Court granted DOL's motion to dismiss all of Sun Valley's claims. The Court first addressed Sun Valley's Article III claim, holding that agency adjudication was appropriate because DOL's action fit within the "public-rights doctrine." *Sun Valley Orchards, LLC v. Dep't of Lab.*, 2023 WL 4784204, at *6 (D.N.J. July 27, 2023). The Court next rejected Sun Valley's claim that DOL lacked statutory authority to impose civil penalties and award back wages in-

---

[2] Sun Valley also alleged that DOL's order was "not supported by substantial evidence," "an abuse of discretion," or "otherwise not in accordance with law." App. 136. The District Court dismissed that claim as well, but Sun Valley does not raise it on appeal.

house, reasoning that the "clear language of the statute" vested DOL with that authority. *Id.* at *7, 10–11. As for its Article II claims, the Court concluded that Sun Valley failed to exhaust the issue before the agency and dismissed on that basis. But it also explained that ratification cured any Appointments Clause defect, and that ALJs are shielded from removal by only one level of good-cause protection. Finally, the Court held that the civil penalty award did not violate the Excessive Fines Clause, explaining that it was "not grossly disproportionate to Sun Valley's offenses." *Id.* at *11. Sun Valley filed this appeal.

## II

The District Court had jurisdiction under 28 U.S.C. § 1331, and we have jurisdiction under 28 U.S.C. § 1291. "A district court's order dismissing a complaint is subject to plenary review." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1197 (3d Cir. 1993). Under the Administrative Procedure Act, we must "hold unlawful and set aside" DOL's action if we find it to be, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

## III

We begin and end with Sun Valley's Article III argument. The Constitution vests "[t]he judicial Power of the United States . . . in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. 3, § 1. The judges of those courts enjoy life tenure and salary protection, attributes that preserve

an "independent spirit" that is "essential to the faithful performance" of their duty. The Federalist No. 78, p. 469 (C. Rossiter ed. 1961) (A. Hamilton). Because non-Article III tribunals lack these important qualities, Congress may not "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty." *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284 (1855).

On top of that rule, the Supreme Court has explained that certain "public rights" cases may be adjudicated outside Article III. *Id.* Because the public rights exception "has no textual basis in the Constitution," it must "derive instead from background legal principles." *Jarkesy*, 603 U.S. at 131. History therefore looms large in the public rights analysis, requiring courts to pay "close attention to the basis for each asserted application of the doctrine." *Id.* In evaluating whether a given case fits within the public rights exception, we look for "a serious and unbroken" history of non-Article-III resolution. *Id.* at 153 (Gorsuch, J., concurring).

With these principles in mind, we turn to Sun Valley's Article III challenge. The farm contends that DOL violated Article III by adjudicating its private rights through in-house proceedings. To resolve this claim, we must decide (1) whether DOL's action concerns private rights (that is, whether it is in the nature of a common law suit), (2) whether DOL's action fits within the public rights exception, and (3) whether Sun Valley waived its right to Article III adjudication.[3]

---

[3] Sun Valley argues on appeal that DOL's adjudication violates "Article III and, by extension, the Seventh Amendment." Sun

A

We first consider whether DOL's enforcement concerns private rights, asking if it "is made of the stuff of the traditional actions at common law tried by the courts at Westminster in 1789." *Id.* at 128 (majority opinion) (citation modified). As the Supreme Court's recent decision in *Jarkesy* explains, a party challenging enforcement under Article III need not match the agency's action to an exact historical comparator. *Id.* at 134. *Jarkesy* considered whether the SEC could, consistent with Article III and the Seventh Amendment, enforce federal antifraud statutes through in-house civil penalty proceedings. *Id.* at 120. The Court said no. *Id.* at 121. The SEC sought civil penalties, which traditionally "could only be enforced in courts of law." *Id.* at 134 (citation modified). And its action, though based on federal law, "target[ed] the same basic conduct as common law fraud, employ[ed] the same terms of art, and operate[d] pursuant to similar legal principles." *Id.* Because both the action and the remedies that the SEC pursued could be traced to English common law, Jarkesy's case presumptively "involve[d] a matter of private rather than public right." *Id.* (citation modified).

Those same considerations require Article III adjudication here. Start with the nature of DOL's claim. While regulations require H-2A employers to provide housing, meals,

_____

Valley Br. 3. The Supreme Court has long recognized the close relationship between Article III and the Seventh Amendment. *See Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 53–54 (1989). And in *Jarkesy*, the Court appeared to confirm their analytical similarity. *See* 603 U.S. at 134. But because Sun Valley's complaint did not allege a violation of the Seventh Amendment, we consider only its challenge under Article III.

transportation, and guaranteed work, employee benefits are formalized in an employer's "job order." *See generally* 20 C.F.R. § 655.122. Where, as here, the employer does not pen another agreement with its employees, the job order functions as a "work contract" between them. *Id.* § 655.122(q). It is the violation of the terms of that work contract, rather than the regulations that shape it, that supports H-2A enforcement actions. *See* 29 C.F.R. § 501.0 (authorizing "the enforcement of all *contractual obligations* . . . applicable to the employment of H-2A workers and workers in corresponding employment").[4]

Consistent with that scheme, DOL framed its enforcement action against Sun Valley in contractual terms. For instance, DOL told the ALJ that "Sun Valley's assurances formed part of the farm's contract with H-2A workers." A.R. 145. It then alleged that Sun Valley "violat[ed]" those "contractual obligations." *Id.* The ALJ's decision, too, sounded partially in contract. For example, the decision found that Sun

---

[4] This contractual framing distinguishes the enforcement action here from the one we recently considered in *Axalta Coating Systems LLC v. FAA*, --- F.4th ---, 2025 WL 1934352 (3d Cir. July 15, 2025). That case considered whether the Seventh Amendment permitted the Federal Aviation Administration to seek civil penalties from a paint supplier through in-house proceedings. *Id.* at *1. The action there involved "technical" hazardous materials regulations with no common law origins, which made it relevantly similar to the Supreme Court's decision in *Atlas Roofing Co. v. Occupational Safety & Health Review Commission*, 430 U.S. 442 (1977). *Axalta*, 2025 WL 1934352, at *5. The enforcement action in this case, by contrast, resembles common law breach of contract, so *Atlas Roofing* does not control.

Valley "breached a material term of the job order" when it
failed to provide employees with kitchen access. App. 83–84.
And it ordered penalties and back wages for Sun Valley's
decision to terminate workers "before they worked the
guaranteed three-fourths of the hours promised in their
contracts." App. 92. DOL's action was therefore litigated like
a suit for breach of contract, which would have traditionally
been heard in common law courts. *See N. Pipeline Constr. Co.
v. Marathon Pipe Line Co.*, 458 U.S. 50, 90 (1982) (Rehnquist,
J., concurring in the judgment) (recognizing "breach of
contract" as "the stuff of the traditional actions at common law
tried by the courts at Westminster in 1789").

We also think it significant that DOL sought common
law remedies: civil penalties and back wages. The Supreme
Court has long maintained that "[a] civil penalty was a type of
remedy at common law that could only be enforced in courts
of law." *Tull v. United States*, 481 U.S. 412, 422 (1987); *see
also Jarkesy*, 603 U.S. at 123. And to the extent that back
wages are designed "to punish or deter the wrongdoer," they,
too, are legal in nature. *Jarkesy*, 603 U.S. at 123 (citation
modified). The ALJ here assessed back wages at least in part
"[t]o deter such harm from occurring in the future." App. 88.
The Administrative Review Board likewise cited the need to
"deter other H-2A employers" when upholding the award.[5]
App. 42. That DOL sought punitive remedies therefore only
confirms that its action was "made of the stuff of the traditional

---

[5] In a different context, we recently described back wages as
an equitable remedy. *See NLRB v. Starbucks Corp.*, 125 F.4th
78, 96 (3d Cir. 2024). But because the back wages here were
imposed to deter wrongdoers, rather than solely to provide
restitution, they are properly characterized as legal. *See
Jarkesy*, 603 U.S. at 123.

actions at common law," presumptively entitling Sun Valley to adjudication before an Article III court. *Jarkesy*, 603 U.S. at 128 (citation modified).

B

DOL resists this conclusion. Despite the appearance of a common law contract action, it contends that this case is really about immigration. And because immigration is traditionally a matter of public rights, DOL insists that Sun Valley was not entitled to adjudication by an Article III court. We are unpersuaded. While history does sanction non-Article III adjudication for certain immigration-related matters, this case falls well outside the heartland of that tradition.

The political branches have long asserted control over the Nation's borders. While the President has possessed some authority to remove aliens since the founding, *see Dep't of State v. Munoz*, 602 U.S. 899, 912 (2024), Congress first enacted general restrictions on immigration during the late nineteenth century, *see Kleindienst v. Mandel*, 408 U.S. 753, 761 (1972). From the beginning, these statutes empowered executive branch officials to adjudicate issues surrounding admission and exclusion. *See Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 129–30 (2020) (collecting statutes).

Recognizing the political branches' "plenary power" over immigration, the Supreme Court largely endorsed this regime of administrative enforcement. *See Castro v. United States Dep't of Homeland Sec.*, 835 F.3d 422, 439–41 (3d Cir. 2016) (citing *Chae Chan Ping v. United States*, 130 U.S. 581 (1889); *Nishimura Ekiu v. United States*, 142 U.S. 651 (1892); *Fong Yue Ting v. United States*, 149 U.S. 698 (1893)). The

Court observed long ago that exclusion was an "incident of sovereignty belonging to the government," so that issue was generally not appropriate "for judicial determination." *Chae Chan Ping*, 130 U.S. at 609. The "plenary power" doctrine has undergone changes since then, *see Castro*, 835 F.3d at 441–44, but the Supreme Court has consistently "recognized that the admission and exclusion of foreign nationals is a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control," *Trump v. Hawaii*, 585 U.S. 667, 702 (2018) (citation modified).

This history provides the foundation for an immigration exception to Article III adjudication. *See Jarkesy*, 603 U.S. at 128–30 (listing "immigration" as an example of "public rights"). But it also suggests limitations. The public rights exception captures only matters that "historically could have been determined exclusively by the executive and legislative branches." *Id.* at 128 (citation modified). And the above historical discussion suggests that non-Article III adjudication was traditionally appropriate in cases closely related to the admission and exclusion of aliens.

The Supreme Court's decision in *Oceanic Steam Navigation Co. v. Stranahan* exemplifies this limitation. 214 U.S. 320 (1909). The plaintiff there, a steamship operator, was sanctioned under a statute authorizing the Secretaries of Labor and Commerce to impose penalties for "bringing into the United States alien immigrants afflicted with 'loathsome or dangerous contagious diseases.'" *Id.* at 332. The operator claimed that this order violated Article III, but the Court disagreed. Congress had "plenary power . . . as to the admission of aliens," so it could authorize executive branch officials to impose a penalty without Article III adjudication. *Id.* at 343. *Oceanic Steam*, the Court would later explain,

stands for the proposition that Congress may "prohibit immigration by certain classes of persons and enforce those prohibitions with administrative penalties assessed without" an independent judge or jury. *Jarkesy*, 603 U.S. at 129. So *Oceanic Steam* related closely to the admission and exclusion of aliens. *See Lloyd Sabaudo Societa Anonima Per Azioni v. Elting*, 287 U.S. 329, 335 (1932) (observing that *Oceanic Steam* concerned the federal government's "plenary power to control the admission of aliens").

Sun Valley's case falls outside the immigration exception and the tradition that shaped it. Although the H-2A program facilitates temporary migration, its labor certification regulations do not directly address the admission and exclusion of aliens. Instead, the labor certification process is designed to vindicate the domestic national policy goal of preserving "the wages and working conditions of workers in the United States." 8 U.S.C. § 1188(a)(1)(B). Rules about worker hours, housing, cooking, and transportation regard employment law, not "Congress' plenary authority to control immigration." Dep't Br. 36. This is especially true considering that H-2A labor certification rules apply to foreign and domestic workers alike. *See* 29 C.F.R. § 501.0. So while H-2A labor certification regulations may ultimately serve immigration-related goals, extending *Oceanic Steam* to reach this case would allow "the exception [to] swallow the rule." *Jarkesy*, 603 U.S. at 131.

DOL disagrees. In its view, the H-2A program implicates "a variety of foreign-policy concerns" that situate it comfortably within the public rights exception. Dep't Br. 33. For example, the Secretaries of State and Homeland Security "determine which countries are eligible to participate in the program," using participation as leverage to achieve foreign and domestic policy objectives. Dep't Br. 8. Because of these

quintessentially public interests, it says, adjudications under the H-2A program need not take place in an Article III court.

This argument proves too much. It is true that portions of the sprawling H-2A program implicate the President's unique power over foreign affairs. But at best, that shows that *some* H-2A-related actions may proceed in agency tribunals. For example, DOL could use agency proceedings to bar Sun Valley from the program or to remove ineligible foreign workers from its employ. *See* 20 C.F.R. § 655.182. Those actions, to the extent they vindicate the federal government's critical interest in border control, likely fall within the immigration exception. But the fact that DOL has *some* authority to proceed in a non-Article III tribunal does not give it carte blanche to do so for *all* violations. Such a rule would eviscerate *Jarkesy*'s instruction that we "evaluate[] the legal basis for [DOL's] assertion [of the public rights] doctrine with care." 603 U.S. at 131.

In short, because the H-2A labor certification regulations mainly concern the federal government's local interest in domestic wages, DOL's action does not fit within the public rights exception to Article III adjudication.

## C

DOL's last-ditch argument is that Sun Valley did not preserve its Article III objection during administrative proceedings. By failing to raise this issue before the ALJ, DOL says, Sun Valley "either waived any Article III claim [] or failed to exhaust it." Dep't Br. 41. We disagree.

For its waiver argument, DOL relies on *Wellness International Network, Ltd. v. Sharif*, 575 U.S. 665 (2015).

That case addressed whether Article III permitted bankruptcy courts to hear non-core proceedings "with the consent of all the parties to the proceeding." *Id.* at 671 (quoting 28 U.S.C. § 157(c)(2)). The Supreme Court answered yes, holding that "Article III is not violated when the parties knowingly and voluntarily consent to adjudication by a bankruptcy judge." *Id.* at 669. Although knowing and voluntary consent could be implied, the Court explained, "the key inquiry [was] whether the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case before the non-Article III adjudicator." *Id.* at 685 (citation modified).

These preconditions for implied consent are not present here. DOL points to no evidence that Sun Valley "was made aware of the need for consent and the right to refuse it." *Id.* (citation modified). To the contrary, DOL's letter assessing civil penalties provided that "the determination of the Administrator shall become the final and unappealable Order of the Secretary" if "a request for a hearing [before an ALJ is not received within the time specified." App. 150. So Sun Valley lacked any real choice about where it could challenge DOL's action, meaning that it "did not truly consent to" adjudication before an ALJ. *Wellness Int'l Network*, 575 U.S. at 681 (citation modified).

We also reject DOL's exhaustion argument. It is true that a party sometimes must exhaust issues it intends to raise during administrative, and later, judicial proceedings. *See Carr v. Saul*, 593 U.S. 83, 88 (2021). But even assuming Sun Valley failed to exhaust its Article III claim before the agency, we may still consider it here. That's because a "nonjurisdictional, mandatory exhaustion requirement functions as an affirmative defense, and thus can be waived or forfeited by the

government's failure to raise it." *Fleming v. United States Dep't of Agric.*, 987 F.3d 1093, 1099 (D.C. Cir. 2021); *see also Santos-Zacaria v. Garland*, 598 U.S. 411, 417 (2023) (explaining that "[e]xhaustion is typically nonjurisdictional"). Because DOL did not raise a failure-to-exhaust defense before the District Court, we will "treat that argument as forfeited." *Simko v. United States Steel Corp.*, 992 F.3d 198, 205 (3d Cir. 2021). DOL has not offered any exceptional circumstances to excuse this forfeiture, so we will not address its exhaustion argument. *Cf. Freeman v. Pittsburgh Glass Works, LLC*, 709 F.3d 240, 250 (3d Cir. 2013) ("The doctrine of appellate waiver is not somehow exempt from itself. This means that a party can waive a waiver argument by not making the argument below or in its briefs." (citation omitted)).[6]

*        *        *

An administrative tribunal ordered Sun Valley to pay civil penalties and back wages for breaching contractual obligations under the H-2A nonimmigrant visa program. Because Article III required the Department of Labor to instead proceed before a federal district court, we will reverse and remand with instruction to enter judgment in favor of Sun Valley.

---

[6] Because we hold that DOL's enforcement action violated Article III, we need not reach Sun Valley's alternative statutory, Article II, and Eighth Amendment arguments.